# EXHIBIT A

**TRUE AND EXACT**
**COPY OF ORIGINAL**

BEFORE THE MINNESOTA
BOARD OF MEDICAL PRACTICE

In the Matter of the
Medical License of
Todd A. Leonard, M.D.
Year of Birth: 1968
License Number: 39,822

**FINDINGS OF**
**FACT, CONCLUSIONS,**
**AND FINAL ORDER**

The above-entitled matter came on for an evidentiary hearing on July 12–16 and 19, 2021,

before Administrative Law Judge ("ALJ") Ann C. O'Reilly, at the request of the Minnesota Board

of Medical Practice ("Board") Complaint Review Committee ("Committee"). The matter was

initiated pursuant to the Notice and Order for Prehearing Conference and Hearing ("Notice of

Hearing") issued by the Committee on August 18, 2020. Keriann L. Riehle and Nicholas Lienesch,

Assistant Attorneys General, represented the Committee. David P. Bunde of Fredrikson & Byron,

P.A., Minneapolis, Minnesota, represented Todd Arthur Leonard, M.D. ("Respondent").

On December 17, 2021, the ALJ issued Findings of Fact, Conclusions of Law, and

Recommendation ("ALJ's Report"), recommending the Board take significant and appropriate

disciplinary action against Respondent. (A true and accurate copy of the ALJ's Report is attached

hereto and incorporated herein as Exhibit A.)

The Board convened to consider the matter on January 8, 2022, at 335 Randolph Avenue,

Suite 140, St. Paul, Minnesota 55102, via WebEx videoconference. The following Board members

were present: Chaitanya Anand, M.B., B.S.; Cheryl L. Bailey, M.D.; Christopher Burkle, M.D.,

J.D., FCLM; Tenbit Emiru, M.D., Ph.D., M.B.A.; Anjali Gupta, M.B., B.S., M.P.H.; Shaunequa

B. James, MSW, LGSW; John M. (Jake) Manahan, J.D.; Allen G. Rasmussen, M.A.; Kimberly

W. Spaulding, M.D., M.P.H.; Jennifer Y. Kendall Thomas, D.O., FAOCPMR; Stuart T. Williams,

J.D.; and Cherie Zachary, M.D., ABAI. Keriann L. Riehle, Assistant Attorney General, appeared

and presented oral argument on behalf of the Committee. Respondent Todd A. Leonard, M.D.,
and his attorney, David P. Bunde, appeared and presented oral argument. Gregory J. Schaefer,
Assistant Attorney General, was present as legal advisor to the Board.

The following Board members did not participate in deliberations: Cheryl L. Bailey, M.D.,
and John M. (Jake) Manahan, J.D. Board staff who assisted the Committee did not participate in
the deliberations.

## FINDINGS OF FACT[1]

The Board has reviewed the record of this proceeding and hereby accepts the December 17,
2021, ALJ's Report and accordingly adopts and incorporates by reference the Findings of Fact
therein. Accordingly, the Board hereby finds as follows:

## I.   Background: Respondent[2] and MEnD

1.     Respondent has been licensed to practice medicine and surgery in the State of
Minnesota since 1997. He is board-certified in family medicine.

2.     Respondent is the owner, president, and former chief medical officer of MEnD
Correctional Care, PLLC (MEnD), which provides contracted medical services to inmates at
county jails. MEnD has contracts to provide correctional health care services at 48 correctional
facilities in five states: Minnesota, Wisconsin, Iowa, Illinois, and South Dakota. At least
75 percent of the facilities served by MEnD are located in Minnesota. With each facility housing
approximately 150 to 200 inmates, MEnD is charged with overseeing the medical care of the
approximately 7,200 to 9,600 inmates, in five different states, at any given time.

---

[1] To conform to the standard format the Board uses for findings of fact and for ease of reading, the
ALJ's citations to the record have been removed from this order and are incorporated herein
pursuant to the ALJ's Report, attached as Exhibit A.
[2] The removal of Respondent's name, repeated throughout the document, is a non-substantive
change made to conform with the Board's standard format in its past orders.

2

3.      This action arises out of Respondent's work as the chief medical officer of MEnD and the supervising/attending physician for the Patient,[3] an inmate-patient at a county jail[4] who died under Respondent's care on September 2, 2018.

4.      Respondent began his professional career by graduating from St. Cloud State University with a bachelor's degree in business marketing.  In 1992, Respondent proceeded to medical school at the University of Minnesota-Duluth.  Upon graduating from medical school in 1996, Respondent began practicing in family medicine with a health care provider[5] in the St. Paul metropolitan area.

5.      In 2006, a county sheriff[6] reached out to Respondent to consult with him regarding the medical care provided to inmates at the county jail.  At that time, the county jail contracted with a health organization[7] to provide health care to its inmates.  Respondent reviewed the services provided by the health organization and offered his opinions regarding efficiencies and cost-saving methods for providing health care services to inmates at the jail.

---

[3] The removal of the Patient's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[4] The removal of the county name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[5] The removal of the hospital name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[6] The removal of the county name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[7] The removal of the health organization's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

3

6.      Shortly thereafter, Respondent accepted a position to serve as the medical director

for the county jail. He was soon approached by a second county[8] to provide consultation services,

and later, contracted with a third county[9] to provide medical services to its jail.

7.      In approximately 2008, Respondent decided to create MEnD, a company that

contracts to provide medical services to local jails and correctional facilities. From its inception

in approximately 2008 until early 2021,[10] Respondent served as the chief medical director of

MEnD, in addition to being the president and founder of the company.

**A.      MEnD Contract With the County Jail**

8.      In 2012, MEnD entered into a Medical Services Agreement with the county to

provide health and medical services to detainees and inmates at the county jail. Under the initial

contract, the county engaged MEnD to provide a medical director, nursing services, and a mental

health specialist. The contract was amended and extended in 2013 to expand the types and hours

of services provided by MEnD.

9.      Under both the initial and amended contracts, the medical director was required to

be "licensed" and provide "general and urgent care to detainees and inmates." In addition, the

medical director was required to:

- Supervise the medical care provided to detainees and inmates;

- Make "appropriate frequency" of visits to the jail to care for inmates, which
  "will typically be once per week for up to 4 hours";

- Perform medical procedures at the jail whenever feasible;

---

[8] The removal of the county name, repeated throughout the document, is a non-substantive change
made to conform with the Board's standard format in its past orders.
[9] The removal of the county name, repeated throughout the document, is a non-substantive change
made to conform with the Board's standard format in its past orders.
[10] In early 2021, MEnD hired a new corporate medical director and Respondent's positions in the
company were limited to president and CEO.

4

- Prescribe medication for detainees and inmates;

- Assist jail and provide administration in budgeting, planning, vendor negotiations, and presentations;

- Assist in the development and review of treatment protocols, policies, and procedures;

- Supervise nursing staff and review medical charts;

- "Be available (or have another licensed provider available) at all times, by phone or in person, to assist nursing staff or answer jail staff questions regarding the medical needs of inmates;" and

- Furnish pre-employment medical examinations as requested for prospective jail personnel upon request.

10.     The contract, as amended, required MEnD to provide registered nurses on site an average of 72 hours per week, "largely during the workday," as well as "[b]e available at all times by at least phone consultation to assist jail staff and answer medical questions regarding care of inmates." This was expanded from the original contract, which required registered nurses to be present 60 hours per week.

11.     When the original contract was amended in 2013, it added provisions that MEnD would also provide health service technicians. These technicians included one full-time lead technician working "business hours" during weekdays and other full- or part-time technicians whose hours included "split shifts" during the weekends. These technicians would not be licensed nurses, but rather, unlicensed healthcare providers (generally nursing assistants or medical assistants) who would be on site at the jail an average of 99 hours per week. These technicians were charged with delivering medications, assisting the registered nurses with routine tasks (such as taking vital signs), and other unlicensed or administrative tasks.

12.     While the contract with the county, as amended, included additional staff and services, it was not contemplated that MEnD would provide on-site, round-the-clock medical care

to inmates. MEnD nursing and medical technician staff were scheduled at the jail during daytime hours on weekdays and split-shifts (mornings and evenings) on the weekends and holidays. A registered nurse (RN) was scheduled to be on site during daytime hours weekdays (Monday through Friday, from 7:00 a.m. or 8:00 a.m. to 4:30 p.m.) and four hours each day on Saturdays, Sundays, and holidays. Medical technicians were scheduled each day for 12 hours a day, with split-shifts (mornings and evenings) on weekends and holidays.

13.     The original contract provided for monthly compensation of $17,075 ($204,900 annually) to MEnD, with annual two-percent increases. When the contract was amended in 2013, and the scope of services expanded, the compensation to MEnD increased but is unavailable in the hearing record due to redaction. According to Respondent, MEnD's net profits in 2020 were "a few" hundred thousand dollars.

14.     While MEnD was the contracted healthcare service provider inside the jail, the agreement expressly noted that MEnD would not be responsible for the medical services and costs provided outside the jail to inmates for whom the county was the detaining authority, including hospital, ambulance, and transportation services. In other words, MEnD was not responsible for the costs of any medical care an inmate required from clinics, hospitals, or healthcare providers outside the jail, including emergency room visits or specialized care.

**B.     MEnD's Internal Policy Manual**

15.     To ensure a proper chain of command for medical decisions, MEnD maintained a Correctional Care Policy Manual, applicable to all of its medical staff and "designated jail personnel." Under this policy, each correctional facility served by MEnD was required to have a designated "Responsible Health Authority" (RHA) and a designated medical provider reporting directly to the RHA.

16.     Under MEnD's Correctional Care Policy, the RHA was responsible for

- Overseeing all of MEnD's "policies/procedures, protocols, forms, and practice philosophies in all MEnD-served facilities;"

- "Review[ing] treatments of detainees by other health care providers (in-house, boarders, outside physicians), as requested or needed by the medical providers in each facility MEnD serves;"

- "Supervis[ing] the care provided to detainees by medical staff and correctional staff." Under the policy, "[t]he RHA will have the final judgment on all medical matters related to the healthcare of detainees that reside in each facility served by MEnD;" and

- Providing peer review for staff medical providers.

17.     At all times relevant herein, Respondent was the designated RHA for MEnD and the county jail. As such, he was responsible for supervising the medical care provided to inmates in the jail by MEnD medical staff. He also maintained final decision-making authority for the healthcare provided to inmates in the jail.

18.     MEnD's Correctional Care Policy provided that the designated medical provider for each facility was responsible for:

- conducting medical visits and assessment for detainees, including diagnosing medical conditions and selecting appropriate treatment options;

- reviewing and prescribing medications for detainees;

- reviewing treatments for all detainees including those done inside or outside the jail during incarceration;

- making decisions for the care of detainees in the jail during their incarceration, "which includes referrals to outside facilities or providers when necessary;" and

- supervising the day-to-day healthcare provided in the jail.

19.    During the relevant time frame herein,[11] with the exception of August 31, 2018, when Respondent delegated his authority to a nurse practitioner for the day, Respondent was effectively the designated medical provider for the county jail.[12]

**C.    Organizational Structure of MEnD**

20.    In 2018, the organizational structure of MEnD included a chief medical officer (Respondent) who had ultimate supervisory authority over all other company healthcare workers and employees.  The positions reporting directly to the chief medical officer (Respondent) at that time included: a director of nursing, a human resources director, "medical providers" (e.g., physician assistants and nurse practitioners), a mental health director, and an office manager.

21.    The director of nursing supervised all nurses, including, indirectly, the health technicians at each facility.  The director of nursing reported directly to Respondent.

22.    Below the director of nursing were regional "nursing directors" who had authority over supervisory RNs (one at each facility) in their regions.  Each facility had a supervising RN, who oversaw staff RNs and the lead health technician at that facility.  Each facility had a lead health technician, who supervised the various health technicians at that facility.

---

[11] August 24 to September 2, 2018.

[12] While Respondent was reluctant to admit he was the designated medical provider for the county jail during the nine days that the Patient was in the jail, it is clear from a totality of the evidence that he effectively served as the designated medical provider for the jail during that time.  Medical Provider #1, a nurse practitioner had just started at the company and was in training, shadowing Respondent on his rounds.  Throughout the Patient's stay in the jail, all medical staff contacted Respondent directly for consultation and direction – and no other medical provider.  Medical Provider #1 served as the jail's medical provider on August 31, 2018, only because Respondent, who was supposed to accompany Medical Provider #1 on rounds at the jail that day, suddenly cancelled and instructed Medical Provider #1 to complete the rounds without him. He, therefore, delegated his authority to Medical Provider #1 that day.  Respondent continued to be the medical provider and supervising physician for the jail on September 1 and 2, 2018.

The removal of Medical Provider #1's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

23.    The organizational chart for MEnD in 2018 was as follows:



24.    Respondent served at the top of the organization chart, as the president and chief medical officer, having direct supervisory authority over the director of nursing and any medical providers assigned to a facility.[13]

25.    "Medical providers" hired by MEnD were not necessarily physicians, but could include other healthcare workers, so long as they were graduates of "an accredited medical provider program" and maintained "a valid, unrestricted medical provider license."  Medical

---

[13] In 2021, Respondent was "reassigned" from his position as medical director and a new "corporate medical director" was hired.  Under the current corporate structure, MEnD has four medical doctors on staff, including Respondent (three fulltime and one parttime), who manage the healthcare staff and medical providers.

providers included physician assistants and nurse practitioners. However, in 2018, Respondent was the sole medical doctor responsible for final oversight over all facilities and medical staff serviced by MEnD.[14] In August 2018, Respondent would make approximately one visit per week to the county jail.

### D.    Nurse #1,[15] Director of Nursing

26.    Nurse #1 is the director of nursing for MEnD, a position she has held since 2016. Nurse #1 was one of the initial employees hired by MEnD after its inception. At the time, Nurse #1 was fresh out of college.

27.    Nurse #1 graduated from St. Catherine's University in 2010 with a bachelor's degree in nursing and became licensed as an RN that same year. After graduation, Nurse #1 accepted her first nursing position with MEnD, where she initially served as a staff RN at three county[16] jails.

28.    As the company grew, Nurse #1's position and responsibilities also expanded. Within the first few months of her employment, she assumed responsibility for MEnD's training programs for both MEnD healthcare workers and the county correctional employees working at the facilities served by MEnD. Within six years, Nurse #1 was promoted to MEnD's director of nursing, overseeing all of MEnD's nursing and medical technician staff. Aside from a short internship during college, Nurse #1's only experience as an RN was obtained through her employment with MEnD.

---

[14] Respondent testified that MEnD had a parttime physician on staff, but that physician worked in Iowa. As MEnD's chief medical officer, however, Respondent had final supervisory authority over all MEnD healthcare staff.

[15] The removal of Nurse #1's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[16] The removal of the county names is a non-substantive change made to conform with the Board's standard format in its past orders.

29.    A couple years into her employment at MEnD, Nurse #1 and Respondent developed a romantic relationship. They even executed what she described as a "love contract," drafted by a lawyer for the company, to openly declare their romantic and professional relationship. At some point in the relationship, Respondent and Nurse #1 moved in together and, as of the date of hearing, they continue to reside together.[17]

30.    By 2018, Nurse #1 was serving as MEnD's director of nursing and was the company's lead trainer and training developer. She was also assisting with human resource issues, helping to manage and build the business, and providing some direct patient care (approximately 10 to 15 hours per week). Her direct supervisor was Respondent, MEnD's owner, president, and chief medical officer at that time.

### E.    MEnD Training Materials

31.    As part of her work as the company's first training director, Nurse #1 developed training materials for MEnD employees and correctional staff. The trainings are typically three to four hours initially (upon the start of a contract) and then annual and ongoing. These trainings warned of unique challenges faced by staff working with inmates in correctional facilities, including the possibility of "inmate manipulation" tactics, boundary issues, and security threats. Some of the training materials developed by Nurse #1 also made light of the inmate population that MEnD served. Examples of these training materials included:

- A cartoon of a healthcare professional physician looking out of a window, while a prisoner lays on an examination table, which included the caption, "You should get out more."

- A training slide about dealing with "demanding inmates" that contained a cartoon that stated, "No, please go on. I'm sure your internet forum has access to more medical literature and has studied it more than I have."

---

[17] In addition to not being able to recall her current salary, she was unable to recall how long she and Respondent have been living together.

- A slide instructing about patient care that included a cartoon of a woman in the bathroom with a caption reading, "Showering won't be enough after today. I'll need to be autoclaved."[18]

- A cartoon at the beginning of a mental health and substance abuse training that has a drawing of a "stoned hippy" with a caption reading, "You must be at least this high to enter." The MEnD commentary under the cartoon reads, "How many times do you feel like this sign should be in the front of your correctional facility???"

- A meme in training materials about inmate mental health issues with the caption, "Crazy people don't know they are crazy. I know I am crazy therefore I am not crazy, isn't that crazy."

32.    The purpose of these cartoons and memes, according to Nurse #1 and Respondent, was to inject "levity" into the subject matter of the training materials and "have a chuckle."

## II.    Care of Inmate/Patient

33.    On Friday, August 24, 2018, the Patient, a 27-year-old Black man, was transferred to the county jail for detainment on criminal charges.   The Patient arrived at the jail at approximately 5:30 p.m. and began the intake process.

34.    Jail video footage shows the Patient arriving at the jail, exiting a police vehicle, and walking into the facility. He appears in good health and is cooperating with the correctional staff. He is able to walk, talk, laugh, and joke with the jailers. While in the second-floor booking room, the Patient can be seen talking, walking, sitting, standing, and even dressing himself. He appears to have no difficulty ambulating or communicating with staff.

### A.    Saturday, August 25, 2018: Initial Health Assessment

35.    As part of the jail's intake process, all inmates and detainees are subject to an initial health assessment.

---

[18] An autoclave is a pressure and steam sterilization mechanism used in medical or laboratory environments.

36.     On Saturday, August 25, 2018, at 9:30 a.m., Nurse #2,[19] RN, the MEnD nursing supervisor at the county jail, conducted the Patient's intake health assessment. At that time, Nurse #2 had been working for MEnD for approximately seven years.

37.     The initial health assessment process conducted by MEnD included obtaining a short medical history from the inmate, as well as the collection of standard health data, such as obtaining the individual's height, weight, blood pressure, temperature, and pulse rate.

38.     At the time of his initial assessment, the Patient's blood pressure measured 152/106, which was considered high for a male of his age. The Patient disclosed a history of chronic migraine headaches, hypertension, depression, and anxiety, as well as a recent incident of respiratory failure (eight months prior) and a traumatic brain injury from five years prior. The Patient also reported being treated with the prescription drug Lisinopril for high blood pressure in the past.

39.     As for current issues he was experiencing, the Patient complained of mid- and upper back pain, particularly between his shoulder blades, as well as a headache.

40.     The Patient reported that he had been incarcerated since August 1, 2018, at another facility. The Patient's primary concern was an ongoing migraine headache. He stated that he was nauseous, was experiencing pain behind his eyeballs, and was sensitive to light and sounds. He stated that he generally treated his migraines with ibuprofen.

41.     During the assessment, Nurse #2 observed that the Patient was "kind" and "happy," was able to walk, and answered all questions presented to him. Based on her assessment, Nurse #2 decided to monitor the Patient's blood pressure and treat his migraine with Tylenol.

---

[19] The removal of Nurse #2's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

42.    As part of that monitoring process, MEnD Medical Technician #1[20] checked the Patient's blood pressure on Sunday, August 26, 2018, and noted that it measured 146/101, indicating continued hypertension.

**B.    Monday, August 27, 2018**

43.    On Monday, August 27, 2018, at approximately 7:35 a.m., the Patient requested another blood pressure check due to pain he was experiencing on the left side of his chest that began near his collar bone and extended into his neck. Based upon this report, Nurse #2 conducted a nursing assessment. The Patient was sweating and stated that the fingers on his left hand were tingling. He noted that he had only slept for approximately three hours, a fact confirmed by a corrections officer. The Patient explained that he had been experiencing severe pain for "some months" in his lower back and between his shoulder blades. However, this back pain was now extending into his right thigh and foot.

44.    Nurse #2 noted that the Patient appeared to be in a great deal of pain. He was hunched over and appeared to be in significantly more discomfort than compared to his initial assessment two days earlier.

45.    Nurse #2 took the Patient's blood pressure, which measured 159/104, and checked his pulse, which measured 101 beats per minute. Concerned with the Patient's high blood pressure, Nurse #2 decided to conduct an electrocardiogram (EKG) to ensure that the Patient was not experiencing a heart attack.

---

[20] The removal of Medical Technician #1's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

46.     As an RN, it was within Nurse #2's scope of practice to conduct an EKG, using the jail's in-house EKG machine, but not to interpret the results, which are set forth in a paper printout. The EKG printout read, "probable inferior infarct," and registered as an "abnormal" result.

47.     Nurse #2 decided to contact Respondent, MEnD's medical director and the designated medical provider for the county jail, to discuss her physical examination of the Patient and the EKG results.  After reviewing the EKG record, Respondent concluded that the EKG registered a "false positive" result and that the Patient did not suffer a recent inferior infarct. Respondent determined that the EKG results were "benign."

48.     Respondent    ordered    one    dose    each    of    ibuprofen    (600    mg),    Tylenol (acetaminophen) (975 mg), and hydroxyzine (50 mg), an anti-anxiety/antihistamine medication. He directed Nurse #2 to ensure that the Patient's blood pressure be checked by the visiting medical provider during the next rounds.

C.      **Tuesday, August 28, 2018**

49.     At approximately 8:30 a.m. on August 28, 2018, Nurse #2 conducted another medical assessment on the Patient.  Prior to the assessment, Nurse #2 contacted the pharmacy that had last filled the Patient's prescription medications, including his blood pressure medicine and Flexeril.  She learned that the Flexeril prescription was last filled in January 2018.  Nurse #2 also learned that the pharmacy had not filled any other prescriptions since April 2018, indicating that the Patient was not regularly taking his high blood pressure medication.[21]

50.     During the assessment, the Patient complained of back pain and numbness on his right side.  He stated that it hurt to walk or lay down.  The Patient recounted that he had fallen out

---

[21] This Finding of Fact has been revised consistent with Committee Exception #1.  The revision to this Finding of Fact is consistent with the evidence presented at the hearing.

of bed sometime during the night and was left to lay on the ground of his cell for 25 minutes, even after speaking with a correctional officer. Nurse #2 observed that the Patient was in tears, moving very slowly, and favoring his right arm.

51.     Nurse #2 took the Patient's vital signs, including checking his blood pressure (156/117), his pulse rate (95 beats per minute), and temperature (98.3 degrees). The Patient's blood pressure reading was consistent with continued hypertension.

52.     Nurse #2 called supervising physician Respondent to discuss her assessment. Respondent believed at the time that the Patient may have suffered an injury from the fall from the bunk, which may have been causing the Patient's back pain and numbness. Respondent prescribed 600 mg of ibuprofen three times a day for seven days; 10 mg of Flexeril twice a day for seven days; and 10 mg of lisinopril (a high blood pressure medicine) daily. He also ordered that the Patient be given 600 mg of ibuprofen and 175 mg of Tylenol immediately. Respondent further directed that correctional officers allow the Patient to have a lower bunk and extra blankets. Respondent did not order any further testing or additional observations.

53.     Respondent told Nurse #2 that he would order blood work to be completed on the Patient if the Patient stayed longer than one week in the jail. Notably, the Patient's medical records indicated that the Patient's "expected out/court date" was September 4, 2018, exactly one week later. In addition, on August 27, 2018 (just one day earlier), the Patient had been granted conditional release, allowing him to be released from jail pending the charges against him if bail was posted. The Patient's next court appearance was scheduled for September 4, 2018 – the Tuesday after the upcoming Labor Day holiday.

54.     MEnD health tech/correctional officer incident call sheets and on-call documentation triage forms both require that an inmate's "expected out/court date" be filled in so

that providers know when an inmate is scheduled for release or for a court appearance that may result in release. According to Nurse #2, she was trained by Nurse #1 to ensure this date was always completed because it was "very important information" for Respondent to consider.

55.     At approximately 8:00 p.m. on August 28, 2018, the Patient sent a "kite" or jail message asking to be taken to the hospital for medical treatment. The message read:

> I need to be seen and taken to the hospital on account of i [sic] can't feel my legs and cannot be physically mobil [sic]. Plz be fast about this because im also in incruciating [sic] pain in all my muscles all over my body.

**D.     Wednesday, August 29, 2018**

56.     At approximately 6:25 a.m. on August 29, 2018, Medical Technician #2,[22] MEnD's lead medical technician at the county jail, contacted nursing supervisor Nurse #2 to advise her that the Patient was unable to feel his legs or ambulate, and that his pain was getting worse. Nurse #2 instructed Medical Technician #2and correctional staff to place the Patient in a medical segregation cell (referred to as a "tank") until a MEnD nurse could arrive at the jail to assess him. Nurse #3,[23] RN, a MEnD staff nurse, was scheduled to arrive at approximately 7:00 a.m. to begin her shift.

57.     There are two medical segregation cells in the county jail (cell #214 and #215), both of which contain surveillance cameras to allow correctional staff to observe and monitor the cells at all times. The surveillance cameras are also constantly recording footage, which can be played back by jail staff.

---

[22] The removal of Medical Technician #2's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.
[23] The removal of Nurse #3's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

58. At approximately 9:24 a.m. on August 29, 2018, the Patient was brought to the second-floor nursing station at the jail for an evaluation by Nurse #3. Nurse #3 began by checking the Patient's foot. She then checked his vital signs, which showed blood pressure of 162/116, a pulse rate of 83 beats per minute, and blood oxygen saturation of 98 percent. In talking with the Patient, she learned that he had not been taking his Flexeril outside of the jail because he felt better without the medication.

59. The Patient explained that he had numbness starting around his belly button and traveling bilaterally down through his legs. He denied any loss of bowel or bladder control. Nurse #3 observed that the Patient was moving his arms, but when she asked him to lift his hands so she could remove the oxygen sensor, he stated that he could not move them. Once the sensor was removed, however, Nurse #3 claimed that the Patient was able to wave his arms and hands around. The Patient stated that his arms and hands would sometimes go numb, and that he had been unable to eat for two days because he could not properly lift his hands.

60. The Patient also reported that he was unable to move his legs. However, Nurse #3 noticed that when the correction officer pushed the Patient in a wheelchair, the Patient was able to lift his feet off the floor and avoid hitting his feet on a medical cart. At the same time, jail staff informed Nurse #3 that the Patient was able to stand and use the telephone earlier in the morning. Both Nurse #3 and the jail staff were skeptical of the Patient's medical claims. Nurse #3's physical examination of the Patient took less than five minutes.

61. Given her skepticism, Nurse #3 requested permission from jail staff to review video footage of the Patient's reported fall from his bunk. The jail administrator granted Nurse #3 permission to review video footage of the Patient in the medical segregation cell on the morning of August 29, 2018. The video footage that she reviewed, however, was not footage of the

18

Patient's fall from the bunk that the Patient reported to Nurse #2 on the morning of August 28,

2018.[24] Nonetheless, in her notes of August 29, 2018, Nurse #3 writes:

> [I] reviewed video of "fall." [Patient] eased himself to the side of bed and
> wheelchair and slowly guided himself to the floor.

62.     The video that Nurse #3 actually reviewed was not the Patient's fall from the bunk

that he reported to Nurse #2 on August 28, 2018, but rather, it was more recent video footage from

the Patient in the medical segregation cell (#215) recorded the morning of August 29, 2018.

Therefore, Nurse #3's notes are inaccurate and improperly imply that the Patient was exaggerating

the fall from the bunk he reported on August 28, 2018.

63.     Nurse #3's notes from August 29, 2018, go on to express further distrust of the

Patient's reported symptoms. Nurse #3 writes:

> [Patient] was able to move himself in wheelchair in front of [me] but when
> [correction officers] attempted to transfer him to bed[,] he went limp and would not
> help them. Lunch was given and [Patient] stated [that] he was unable to eat it [due
> to] numbness in hands and unable to swallow. [Patient] was watched swallowing
> multiple times during talk with [me] [without] any difficulty, such as head
> movements or enhanced movements [with] swallowing. [Patient] requested to be
> moved back to [block].

---

[24] The fall reported by the Patient on the morning of August 28, 2018, occurred either during the
night of August 27 or in the early morning hours of August 28, 2018 (the report of the fall was
made around 8:30 a.m. on August 28, 2018). At that time (August 27 and 28, 2018), the Patient
was still in a cell with the general jail population – he was not in the medical segregation unit that
was under individualized video surveillance. In addition, the Patient did not receive a wheelchair
for his personal use until his transfer to the medical segregation cell. A correctional officer's report
notes that he asked MEnD staff to transfer the Patient to a medical segregation cell at
approximately 6:30 a.m. on August 29, 2018, so that the Patient could be monitored on camera.
The Patient was moved to the medical segregation cell #215 at approximately 6:55 a.m. on
August 29, 2018. The Patient was not under individualized video surveillance and did not have
access to a wheelchair at the time of the fall he reported on August 28, 2018. Therefore, Nurse #3
did not view video of the fall from the bunk that the Patient reported on August 28, 2018.

This footnote has been revised consistent with Committee Exception #2. The revision to this
Finding of Fact is consistent with the evidence presented at the hearing. The removal of the
correctional officer's name in this footnote is a non-substantive change made to conform with the
Board's standard format in its past orders.

### 1.   Video Footage Reviewed by Nurse #3 (August 29, 2018)

64.    The video that Nurse #3 reviewed begins at 7:57 a.m. on August 29, 2018, and continues until 9:52 a.m. that same day.  The footage begins with the Patient sitting in a wheelchair apparently talking with someone who is outside the cell.  The Patient is moving his arms and feet. The Patient pushes himself to the toilet, while in the chair, and spends a few minutes attempting to do something at the toilet.  An officer enters the cell to remove bedding from the cot.  At 7:21 a.m., the Patient is given medication and an officer replaces the Patient's bedding.  The Patient lifts his legs using his hands and places them on the cot, while he remains seated in the wheelchair. The Patient's legs are fully outstretched, resting on the bed, while the remainder of his body is seated in the chair.

65.    At 8:04 a.m., the Patient slides himself out of the chair and onto the floor.  He sits upright for a minute, as he attempts to scoot his body forward, but then falls to the ground and lays on his side.  He rolls and twists on the floor until 9:07 a.m., when two officers enter the cell and lift him back into the wheelchair.  The Patient uses his hands to lift his legs back onto the cot, while remaining seated in the chair (his legs outstretched on the cot).  An officer arranges the mattress under his legs while the Patient shakes his feet.

66.    At 9:11 a.m. an officer wheels the Patient out of the cell and returns him to the cell a minute later.  The officer lifts the Patient's legs onto the cot as the Patient remains seated in the chair.  The Patient throws a blanket over his legs and places a pillow behind his back.  At 9:25 a.m., an officer enters the cell and wheels the Patient away from the bed and out of the cell.  The Patient is wiggling in the chair and is able to move his feet and arms.  The Patient is brought back into the room at 9:32 a.m.  The officer places the Patient's legs on the bed for him (as the Patient

remains seated in the wheelchair) and the Patient remains in that position until the end of the video at 9:52 a.m.

67.    Thus, contrary to her notes, Nurse #3 did not observe video of the Patient's fall from the bunk that the Patient described to Nurse #2 the day before (August 28, 2018). Instead, Nurse #3 observed video of the Patient from the medical segregation cell shortly after he was moved to that room. As the video depicts, the Patient is not falling from a bunk – he is attempting to get out of the wheelchair and slides to the floor.

### 2.    Nurse #3's Report to Respondent (August 29, 2018)

68.    After her evaluation of the Patient on August 29, 2018, Nurse #3 called Respondent to report her findings and suspicions about the veracity of the Patient's symptoms and illness. At that time, Respondent notes that Nurse #3 had "healthy skepticism" about the Patient's complaints. Through his conversation with Nurse #3, Respondent understood that the Patient's report of a fall from the bunk on August 28 was what Nurse #3 observed on video.

69.    Based upon Nurse #3's representations, Respondent ordered Nurse #3 to discontinue Flexeril and remove the Patient's access to a wheelchair. In its place, Respondent permitted the Patient to have access to a walker temporarily, but stated that access to the walker would also be discontinued "shortly." Respondent directed Nurse #3 to start 24-hour observation of the Patient in the "tank" (the medical observation unit). Respondent's rationale for removing the Patient's access to the wheelchair was to determine whether the Patient's reported symptoms of paralysis were real or merely contrived.

### E.    Thursday, August 30, 2018

70.    The next day, August 30, 2018, Nurse #2 arrived for her shift and checked in on the Patient at approximately 7:40 a.m. The Patient stated that he could not feel anything from his

waist down and had urinated on himself because he was unable to ambulate to the toilet in the jail

cell. Nurse #2 attempted to give the Patient ibuprofen and Lisinopril, but the Patient said he was

unable to swallow the pills because his throat felt swollen. Nurse #2's notes from the visit state

that she conducted an examination and did not notice any swelling.

71.     Nurse #2 then decided to test the Patient's reflexes by running a blunt object (in

this case, a thermometer) along the soles of the Patient's feet. When Nurse #2 ran the thermometer

across the soles of his feet, she noticed that the Patient did not move at all. Nurse #2 then tested

the Patient's vital signs, which indicated a blood pressure of 168/109 (indicating hypertension), a

pulse rate of 92 beats per minute, and an oxygen saturation of 98 percent (within the normal range).

72.     Nurse #2 noted that the Patient looked "very defeated;" he had urinated on himself,

could not swallow, had no reflexes in his feet upon stimulation, and his blood pressure was

elevated. Nurse #2 stated that she "trusted her gut" and "didn't like" what she saw when she

observed him. Therefore, she decided to contact Respondent for further direction. Nurse #2

advised Respondent that the Patient needed to be seen at a hospital.

73.     Respondent agreed with Nurse #2's assessment and directed Nurse #2 to send the

Patient to the emergency room for evaluation.

### 1.     Video Footage of the Patient's Condition on August 30, 2018

74.     Video footage taken of the Patient in the jail cell (#215) around 7:30 a.m. shows

the Patient laying in a cot, minimally responsive to medical staff and correctional officers who

enter the cell. The Patient is able to move his head from side to side and move his hands, but he

remains on his back without any attempt to lift his head or body when others entered the room. At

one point in the video, the Patient's head is awkwardly resting against the concrete wall of the cell

and a correctional officer comes into the cell to pull the Patient's cot mattress down to the foot of

the bed to free the Patient's head from against the wall. It is apparent that the Patient lacked the ability to re-position himself and free his head from against the concrete wall.

75.    At approximately 9:05 a.m., three correctional officers come into the Patient's cell to lift him from the cot to a wheelchair to assist him to use the in-cell toilet. One officer removes the blanket from the Patient to reveal that the Patient is naked from the waist down; he has been laying in his cot without pants, underpants, or an adult brief. With some wrangling, three officers are able to lift the Patient's limp body into the wheelchair without any assistance from the Patient. As the officers push the wheelchair forward, the Patient's limp legs get caught under the chair as it is rolled forward – the Patient appears to be unable to move his own legs and prevent them from being run over by the chair. As a result, the officers roll the chair backwards to the toilet. Two officers lift the Patient and place him on the toilet seat, where he slumps over. At one point, the officers are able to prop the Patient against the back wall so that the Patient can remain seated on the toilet seat. After a few minutes, the officers lift the Patient off the toilet and place him back into the wheelchair. They roll the wheelchair to the cot, lift the Patient's legs onto the cot, and leave the Patient slumped in the wheelchair, with his legs resting on the bed.

### 2.    Override of Respondent's Directive that the Patient be Transported to the ER

76.    At approximately 1:30 p.m., Nurse #2 spoke with the county jail Administrator ("Administrator")[25] about transporting the Patient to the nearby emergency room. The Administrator, however, refused to authorize the Patient's release or transport, despite the medical directive from Respondent. The Administrator reasoned that the Patient was located in a medical observation cell, was being monitored by jail staff, and had been observed by correction officers

---

[25] The removal of the County Jail Administrator's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

using his arms and legs with no difficulty. The Administrator claimed that jail staff observed the Patient able to use his hands to open and drink a juice box. The Administrator advised Nurse #2 that the Patient was considered a flight risk and may attempt to use a hospital transfer to escape, which was why the administrator was denying Respondent's directive to transport the Patient to the emergency room.

77.     Nurse #2 called Respondent again to inform him of the Administrator's refusal to allow the Patient to be transported to the hospital and the Administrator's override of Respondent's medical directive. Nurse #2 explained that correction officers had intercepted recorded phone calls in which the Patient was "plotting" an escape and that the Administrator was unyielding in her refusal to release the Patient to a hospital due to a concern that he was a "flight risk."

78.     Respondent did not attempt to contact the Administrator directly to demand the Patient's transport to the hospital. Nor did Respondent call 911 himself or direct Nurse #2 to call 911 to obtain an ambulance transport of the Patient to the emergency room. Instead, Respondent directed Nurse #2 to continue monitoring the Patient. Respondent explained that a MEnD medical provider was scheduled to be present at the jail the next morning for rounds, who would be able to assess the Patient. Notably, Respondent had never had a jail administrator overrule his medical directives before.

79.     At approximately 2:25 p.m., Nurse #2 entered the Patient's jail cell again. She advised him that the Administrator would not allow him to go to the emergency room and that a MEnD medical provider would be coming the next day to evaluate him.

3.  **Video Footage of the Patient at Time of the Administrator's Refusal to Transport the Patient to Emergency Room (2:25 p.m. on August 30, 2018)**

80.  Video surveillance footage from the jail cell at approximately 2:25 p.m. on August 30, 2018, shows Nurse #2 talking to the Patient as he is sitting in a wheelchair in the corner of the cell. He has no pants on and is covering his lap with a blanket. He is holding an adult brief. After Nurse #2 leaves the room, the Patient attempts to put on the adult brief but is unable to move his legs. He spends over 30 minutes attempting to put on the adult brief until he collapses onto the nearby cot from his seated position in the wheelchair. He slips from the bed and falls to the cement floor, where he lays naked from the waist down. After approximately 10 minutes, three correction officers enter the cell and lift the Patient to his cot. One officer puts some adult briefs by the Patient's head and speaks to him for several minutes. Another officer comes in to mop the floor, cleaning up what appears to be urine and a bright red liquid substance.

**F.    Friday, August 31, 2018**

81.  The Labor Day weekend of 2018 began on Friday, August 31, 2018, and continued through Monday, September 3, 2018.[26]

82.  Medical Provider #1 is an RN and nurse practitioner who had recently been hired by MEnD in early August 2018, to serve as a "medical provider." Medical Provider #1 was scheduled to work on August 31, 2018, as part of her initial orientation and training with MEnD. From her start date in early August 2018, until August 30, 2018, Medical Provider #1's MEnD training included "shadowing" Respondent on rounds at the various facilities serviced by MEnD.[27]

---

[26] *See* 2018 calendar at https://www.timeanddate.com/calendar/?year=2018&country=1.

[27] During the Board's investigation of this case, Medical Provider #1 noted that Respondent was the only doctor at MEnD and her supervisor. He "dictated all the care and all the orders" for inmates, although he did not actually see patients. Instead, he would mainly review charts that nurses provided, conduct medication reviews, and prescribe.

While Medical Provider #1 was in training, Respondent continued to serve as the designated medical provider for the county jail.[28]

83.      Medical Provider #1began her day on August 31, 2018, expecting to meet Respondent at the county jail, and accompany him on his rounds as the MEnD medical provider serving the jail that day.  However, on her drive, just minutes before she arrived at the jail, Respondent called Medical Provider #1and informed her that he would not be able to make it to the jail and that Medical Provider #1was to complete rounds on her own. This was the first day in her employment with MEnD that Medical Provider #1 would be working independently.  Despite Respondent's knowledge of the Patient's urgent need for medical care, Respondent did not advise Medical Provider #1 about the Patient or his need for immediate care or evaluation.

84.      Upon arrival at the jail, Medical Provider #1 proceeded to the nurses' station where she encountered Nurse #2 and Medical Technician #2 discussing an inmate (the Patient) who was "faking" paralysis and incontinence.  In the "control room" of the jail, Medical Provider #1 also overheard three or four correction officers similarly discussing the inmate (the Patient) and how he was "faking" an illness.  One officer asked Medical Provider #1, "Don't you know what he did?" and advised her that the Patient was incarcerated for child abuse.  These correction officers were making fun of the Patient, laughing about how he would not wear an adult diaper.

85.      Medical Provider #1 decided to review the Patient's medical charts before examining him.  She noted that the Patient had been suffering with hypertension during his time

---

[28] While Respondent was evasive in his answers to the Judge's questions in this regard, it cannot be disputed that Respondent was serving as the acting medical provider for the county jail at all times relevant to this action.  Respondent was scheduled to conduct rounds at the jail on August 31, 2018, with his trainee Medical Provider #1, but suddenly cancelled just before Medical Provider #1 arrived.  Respondent continued to act as the medical director for the jail and attending physician for the Patient throughout the Patient's stay at the county jail from August 25 to September 2, 2018.

at the jail and was not taking his medications due to an inability to swallow. She also reviewed the EKG that Nurse #2 had performed on August 27, 2018, that indicated that the Patient had suffered a probable[29] inferior infarct. Nurse #2 informed Medical Provider #1 that Respondent knew about the EKG but was not concerned with the results.

86.    Medical Provider #1 proceeded to conduct a medical examination of the Patient at approximately 9:45 a.m. When Medical Provider #1and Nurse #2 entered the cell to conduct the examination, they found the Patient laying on a mat on the concrete floor of the cell with a thin blanket covering his lower body. His head was not on a pillow and he was unable to lift his head. The cell smelled strongly of urine and sweat. The Patient's adult brief was fully saturated with urine, which had leaked and soaked the mat upon which the Patient was lying. The Patient expressed that he was embarrassed because of this, but no one would assist him with cleaning or changing.

87.    Medical Provider #1began her examination by having Nurse #2 take the Patient's vital signs. The Patient's blood pressure measured 183/116, his oxygen saturation was at 83 percent, and his pulse count was 113 beats per minute, all indicating that he was suffering a serious medical condition. The Patient explained that he had severe back pain and he was numb from his waist down. In reviewing his medical history, Medical Provider #1noted that the Patient complained of numbness from his stomach down for three to four days, and that he was now unable to stand. During her physical examination of the Patient, Medical Provider #1 noticed that the Patient had "diffuse muscle weakness," which was most pronounced on the right side.

---

[29] This Finding of Fact has been revised consistent with Committee Exception #3. The revision to this Finding of Fact is consistent with the evidence presented at the hearing.

88.     Medical Provider #1observed that the right side of the Patient's mouth was drooping, he had tears on his cheeks, and his speech was slurred.  He was also drooling and had urinated and defecated on himself.  To test his neurological function, Medical Provider #1checked for a "Babinski sign," an involuntary reflex response to a specific form of stimulus obtained by running a blunt object along the sole of a patient's foot.  An affirmative Babinski sign results in the upward bending of the big toe and the fanning of the other toes in response to the stimulus.  An affirmative Babinski sign indicates that there may be an underlying nervous system or brain condition causing the reflexes to react abnormally.  Medical Provider #1 noted that the Patient had no response to the Babinski test at all.

89.     Medical Provider #1 also noticed that the Patient was having difficulty swallowing.  He pleaded with Medical Provider #1 to believe him that something was seriously wrong.  Nurse #2 described the Patient as crying and "begging for help."

90.     Medical Provider #1initially thought that the Patient may have suffered a stroke.  After her assessment, however, Medical Provider #1ruled out a cerebrovascular accident (CVA) and diagnosed the Patient with uncontrolled hypertension.

91.     Medical Provider #1decided that the Patient needed to be immediately transported by ambulance to the nearest hospital for treatment.  Medical Provider #1instructed Nurse #2 to arrange for an ambulance to transport the Patient to the hospital immediately.  It is unclear in the record whether it was Medical Provider #1 or Nurse #2 who spoke with the Administrator about the transport.  According to Medical Provider #1, the Administrator told Nurse #2 that she would not allow the Patient to be transported by ambulance, but that she would approve the transport to the emergency room by officers in a police vehicle.

92.     To prepare him for transport, and because he was dirty and soaked in urine, Medical Provider #1 decided to change the Patient into an orange set of "scrubs," the type of attire required by the jail to transport inmates outside of the facility.  The Patient begged Medical Provider #1 to not let the correction officers touch him because he was scared of them.

93.     Nurse #2 began by changing the Patient's adult brief and putting a pair of orange pants on him.  The Patient was completely limp and unable to assist Nurse #2 in the clothing change.  According to Medical Provider #1, he was "like moving dead weight."  Medical Provider #1 further noticed that the Patient was cold to the touch, but yet covered in sweat.

94.     The nurses grew frustrated because none of the correction officers were helping the women, so Nurse #2 went to the officer station to request assistance.  Medical Provider #1 noted that the correction officers were reluctant to help and would not touch the Patient.  Finally, Nurse #2 was able to get three male officers into the room to assist with changing the Patient and getting him into a wheelchair.  Two of the three officers lifted the Patient into the wheelchair and Nurse #2 was able to change the Patient's shirt.  The Patient was entirely limp and unable to assist with the change of clothes.  The Patient was able to sit in the wheelchair but kept slumping forward, such that Nurse #2 had to hold him in the chair as an officer wheeled him from the room.

95.     Video surveillance footage of the jail cell from 8:50 a.m. to 10:00 a.m. on August 31, 2018, corroborates the testimony of Nurse #2 and Medical Provider #1.  The video depicts the Patient lying on a mat on the cell floor, limp and despondent, unable to assist the nurses or officers in their attempts to move him.

96.     After sending the Patient to the emergency room, Medical Provider #1 spoke with Respondent again.  Medical Provider #1 explained that she had concerns about a CVA (stroke).  Respondent did not oppose Medical Provider #1's decision to send the Patient to the hospital for

evaluation, but was upset with the fact that Medical Provider #1 did not contact him before giving

the medical directive to send the patient to the emergency room.

97.     At this point in time, a diagnosis of Guillain-Barre Syndrome crossed Respondent's

mind as a potential cause of the Patient's symptoms, and he discussed this "differential diagnosis"

with Medical Provider #1.  Guillain-Barre Syndrome is a rare autoimmune disorder in which a

person's own immune system attacks the nerves, causing progressive muscle weakness, numbness,

tingling, pain in the limbs, and paralysis.  In some cases, Guillain-Barre Syndrome can be fatal.

### G.     Two Hospital Visits – Friday, August 31, 2018

98.     The county jail deputies transported the Patient to the emergency room,[30] where he

arrived at approximately 10:34 a.m. on August 31, 2018.  While at the hospital, the Patient was

seen by ER Doctor #1.[31]  ER Doctor #1's admission note reads:

> [The Patient] is a 27 yr old male who presents to the Emergency Department [f]rom
> jail secondary to the fact that he says that he cannot move or feel either one of his
> lower legs. This [has] apparently been going on for 4 days. 4 days ago he said he
> fell out of his top bunk and since then he's had back pain and has been unable to
> move his lower legs or feel his lower legs. He has pain in his lower back and also
> his upper back. He also says that he's had trouble moving his upper arms also [sic].
> When I ask about numbness he said "everything is numb." He cannot pinpoint it.
> About 2 days ago he started having a left facial droop and couldn't use the left side
> of the face. He's not complaining of any chest or abdominal pain.

99.     During the examination, ER Doctor #1 observed that the Patient had a left-side

facial droop that included his forehead.  He also noted that the Patient could not move his lower

legs and did not react to painful stimuli.  The Patient was able to move his upper extremities,

although he stated that he was weak, his arms were numb, and he could not react to resistance.  A

---

[30] The removal of the health organization's name, repeated throughout the document, is a non-
substantive change made to conform with the Board's standard format in its past orders.
[31] The removal of ER Doctor #1's name, repeated throughout the document, is a non-substantive
change made to conform with the Board's standard format in its past orders.

rapid drug screen showed only the residual existence of Tetrahydrocannabinol (THC), the active ingredient in marijuana.

100.    ER Doctor #1 ordered a CT scan of the Patient's head, cervical spine, abdomen, pelvis, and chest, along with a complete blood count. The CT scans showed no evidence of trauma. As a result, ER Doctor #1 decided to order a magnetic resonance imaging (MRI) of the Patient's brain and spine. However, ER Doctor #1 did not have access to an MRI machine at that time. As a result, he ordered that the Patient be transferred to a hospital that had an MRI machine.

101.    The discharge summary written by ER Doctor #1 states:

> The patient has symptoms of uncertain etiology at this time. He continues to not move his lower extremities, the facial droop may be Bell's palsy since it does include the forehead, however[,] without MRIs[,] I cannot rule out [spinal] cord compression or CVA. I did do CAT scans which show no evidence of any fractures, dissections, or any other acute traumatic processes. Unfortunately at this time I cannot get the MRIs that are needed to rule out any significant cord compression or other significant emergent processes. I did speak to the ER director who spoke to MRI and at this time I cannot get them done, therefore they recommend I transfer the patient. I spoke to the emergency physician [. . .], and they will accept the patient. Patient will be transferred for further workup and evaluation.

102.    After a physical examination and a review of the Patient's vital signs, blood work, and CT scans, ER Doctor #1 concluded that he could not diagnose the Patient's medical condition and considered the following "differential diagnoses": spinal cord compression, fracture, contusions, malingering, Bell's palsy, cerebral vascular accident, and aortic dissection.

103.    The Patient was discharged from the emergency room at approximately 3:00 p.m. and transferred by ambulance to an[32]emergency room in North Dakota, approximately two hours away. The county jail deputies accompanied the Patient.

---

[32] The removal of health organization's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

104.    The Patient arrived at the medical facility at approximately 5:35 p.m. and was examined by ER Doctor #2.[33] The Patient's vital signs indicated a temperature of 98.1 degrees, a pulse rate of 128 beats per minute, a blood oxygen saturation of 100 percent, and blood pressure of 174/118. ER Doctor #2 noted that the Patient exhibited "facial asymmetry, weakness, and numbness," but did not notice any speech difficulty. As ordered by ER Doctor #1, MRIs of the Patient's entire spine and brain were performed, but the tests identified no abnormalities.

105.    The Patient was under observation and testing at the hospital from approximately 5:30 p.m. until 11:15 p.m. It appears that the Patient remained in four-point restraints (hands and ankles handcuffed to a medical gurney) at all times at the hospital, except for when the MRI was completed. It is unclear how hospital staff conducted a full physical examination of the Patient's ability to move when he was so shackled.

106.    After examination, observation, and testing, ER Doctor #2 summarized the Patient's visit, as follows:

> 27-year-old male arriving as a transfer from [another emergency room], Minnesota with request of MRI. Upon arrival[,] the patient is noted to be alert, afebrile, and hemodynamically stable with slight hypertension and tachycardia. Externally the patient has no trauma to the head or neck. He is interactive and GCS is 15. He reports generalized weakness to the upper or lower extremities[,] however sensation is intent and symmetric. I am able to elicit a[n] appropriate Babinski test. The patient does pull away from painful stimuli of lower extremities. This time he has no pain with palpation of the back. There is no evidence of overlying skin infection or abscess. I believe this would be atypical to affect both the cranial nerves and upper and lower extremities symmetrically. However[,] based on outside examination and recommendation for MRI, we did obtain MRI of the brain[,] as well as entire spinal cord[,] with no abnormalities. Laboratory studies demonstrate no obvious cause for symptoms. In the emergency department [he] remains slightly tachycardic. **Following MRI[,] [] a second deputy arrived providing further history that the patient was reportedly on a monitor last evening unknown to the patient[.] [He] was witnessed moving his extremities without apparent difficulty.** At this time[,] after a prolonged period of observation [in] the emergency

---

[33] The removal of ER Doctor #2's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

department[,] I do not find a cause for acute progressive neurologic condition warranting emergency hospitalization. I did discuss both with the deputy sheriffs as well as patient indications for emergent return locally or to [this emergency room]. At this time the patient will be dismissed to return to jail.

107.    These notes indicate at least one county jail deputy was advising the doctor that the Patient was likely feigning his illness.

108.    In addition, one nursing note reads: "[patient] witnessed wiggling toes in bed while RN's are outside of room standing in doorway."

109.    Consistent with the information provided by the deputy and nurse, ER Doctor #2's final diagnosis was: (1) malingering; and (2) weakness. "Malingering" was noted as ER Doctor #2's primary clinical impression.

110.    The Patient's discharge instructions read:

You have been seen today for generalized weakness. This may also be described as fatigue.

Weakness is a common problem, especially in older individuals.

It is important to understand the difference between true weakness (real weakness from a nerve or brain problem) and the more common problem of fatigue. These words might seem similar, but they do mean very different problems.

- Fatigue: When a person is describing fatigue, they may feel tired out very quickly even with just a little activity. They may also say they are feeling tired, sleepy, easily exhausted and unable to do normal daily activities because they don't seem to have enough energy.

- True Weakness: When someone has true weakness, it means that the muscles are not working right. For example, a leg might be truly weak if you can't support your weight on it or if you can't get up from a chair because the thigh muscles aren't strong enough.

There are many causes of weakness including: infections (often kidney/bladder infections or pneumonias), electrolyte abnormalities (low sodium, low potassium), depression, and neurologic (brain or nerve disorders).

After looking at the results of the blood tests or X-rays, the cause of your weakness is:

- Unclear or unknown.

It is VERY IMPORTANT to see your primary care doctor. More testing may be needed to figure out the cause of your weakness.

YOU SHOULD SEEK MEDICAL ATTENTION IMMEDIATELY, EITHER HERE OR AT THE NEAREST EMERGENCY DEPARTMENT, IF ANY OF THE FOLLOWING OCCURS:

- Confusion, coma, agitation (becoming anxious or irritable).
- Fever (temperature higher than 100.4°F / 38° C), vomiting
- Severe headache
- Signs of a stroke (paralysis or numbness on one side of the body, drooping on one side of the face, difficulty talking)
- Worsening weakness, difficulty standing, paralysis, loss of control of the bladder or bowels or difficulty swallowing.

111.    The Patient was discharged from the hospital at approximately 11:15 p.m. on August 31, 2018.  He was then transported back to the county jail by deputies.

**H.    Saturday, September 1, 2018**

**1.    Arrival Back at the Jail (12:30 a.m.)**

112.    The Patient arrived back at the jail at approximately 12:30 a.m. on September 1, 2018.  Video footage from the jail's garage port shows the Patient's condition and treatment by deputies upon arrival back at the jail.

113.    The video begins with four deputies talking in the garage, while the Patient remains locked inside the police vehicle.  One of the deputies opens the car door and attempts to get the Patient out of the vehicle.  The Patient falls onto the concrete garage floor.  While he lays on the ground, four deputies stand over him and look down on him, but do not render any assistance.  Then, two deputies attempt to drag the Patient into a nearby wheelchair by grabbing him by his arms.  The Patient is completely limp and listless.  He slips out of the wheelchair and falls to the ground.  Once again, the deputies stand over him and appear to be talking to him.  The Patient does

34

not move and appears unresponsive. The deputies stand over him for approximately a minute or two, as the Patient lays, face down, on the concrete floor. Finally, two deputies lift the Patient into the wheelchair and get him to sit up. The Patient is limp as his head falls backward and forward. The deputies then wheel him into the jail and place him back into a medical segregation cell (#214).

114. Video footage of the Patient in his medical segregation cell from 12:45 a.m. to 6:00 a.m. depicts three deputies carrying the Patient into the cell and placing him onto a cot, with his feet overhanging the bed. The Patient is completely limp and appears unconscious. The deputies remove handcuffs from his wrists and ankles.

115. A few minutes later, an officer comes into the room, places a pillow above the Patient's head, and lays a blanket beside him. The officer spends several minutes in the cell standing over the Patient, apparently talking to him, but the video is soundless so it is unclear whether the Patient was able to respond in any manner. The Patient appears semi-conscious. Before leaving the cell, the officer throws the blanket over the Patient's body.

116. The Patient does not change positions for the next nearly two hours (from 12:45 a.m. to 2:33 a.m.). He is lying on his back, his feet are hanging over the bed, and his left arm is hanging off the bed. At 2:33 a.m., the Patient begins to shake and rolls off the cot, falling face-first onto the concrete floor. His shirt is pulled up, exposing his bare midsection, as he remains on the floor, in the same position, until at least 5:50 a.m. (over three hours), when the video ends. This all occurs while correctional staff were apparently monitoring the Patient via video from the control room.

117. By the time the correction officers returned the Patient to the jail on September 1, 2018, they were under the impression that the Patient was faking his illness (due to the hospital diagnosis of "malingering") and attempting to "manipulate" jail staff. According to one officer,

because the Patient was facing a significant amount of prison time for his alleged criminal offense,

he was deemed a "high flight risk" and could be using the illness in an attempt to escape.

### 2.  Early Morning Briefing

118.  The first note in the Patient's jail medical records from September 1, 2018, was

written by Medical Technician #1, an unlicensed medical technician employed by MEnD.  That

note states:

> At approximately 0800 pt [Patient] stated he was on drugs while in jail and that's
> what caused him to get sick. Gave the pt [Patient] a specimen cup to obtain a urine
> drug screen to see if he was positive for anything. At 12:20 p.m. urine was still not
> given.

119.  According to correction officer reports, the Patient told two officers that he had

consumed drugs while in the county jail and gave a detailed account of how he allegedly received

those drugs.  Notably, however, the Patient had received a full drug screen while in the emergency

room just a few hours earlier and that drug screen detected no signs of illicit drugs other than THC.

120.  Nurse #1, MEnD's director of nursing at the time, was the RN on duty at the county

jail the weekend of September 1 and 2, 2018.  While Nurse #1 did not normally work in the county

jail, she agreed to cover the holiday shift because MEnD was short-staffed that weekend.  Recall

that Nurse #1 was (and remains) Respondent's romantic partner and live-in girlfriend.  Nurse #1

was aware of the Patient prior to the start of her shift.

121.  Sergeant #1[34] was the correctional officer in charge at the county jail on

September 1, 2018.  Sergeant #1 began her shift that morning with a briefing by Sergeant #2[35] who

told her that the Patient returned from the hospital during the night and that doctors at the hospital

---

[34] The removal of Sergeant #1's name, repeated throughout the document, is a non-substantive
change made to conform with the Board's standard format in its past orders.

[35] The removal of Sergeant #2's name, repeated throughout the document, is a non-substantive
change made to conform with the Board's standard format in its past orders.

"were unable to find anything medically wrong with him." Sergeant #1 then called the Administrator to advise her of the Patient's condition and to request further direction. Sergeant #1 explained that the Patient "was continuing to not move his extremities around much and that if staff tried to assist him, he would just go limp and was dead weight." Sergeant #1 asked the Administrator if jail staff should assist the Patient with "toileting, feeding, etc." even though the hospital "found nothing medically wrong with him." The Administrator directed Sergeant #1 to speak with MEnD medical staff to obtain further instructions on what the jail should do for the Patient.

122.    Sergeant #1 asked MEnD's on-duty medical technician, Medical Technician #1, to call Nurse #1 and see when she would be arriving for her shift. Medical Technician #1 responded that Nurse #1 would be arriving shortly.

123.    Nurse #1 arrived for her shift at the county jail at approximately 11:22 a.m. on Saturday, September 1, 2018. Upon her arrival, Sergeant #1 spoke with Nurse #1. According to Sergeant #1's report:

> When MEnD [N]urse [#1]arrived[,] I let her know that [the Patient] was continuing to tell staff that he was unable to move his extremities and that he couldn't feel his legs. I also let her know that he was continuing to not move around much and that he was just remaining to lay on his bed. I did tell her that [he] has been communicating with staff. I asked her if she could see him and advise us what we need to be doing for him. I also asked whether or not we should be assisting him with toileting, eating, etc. due to the fact that he was cleared by the hospital. Nurse [#1] told me that she needed to review his medical records and to see him and then she would let us know.

124.    Nurse #1 began her shift by reviewing the Patient's hospital discharge record that indicated that the Patient had been diagnosed with "malingering and weakness" at the hospital the night before, and that no new medical orders were given. Nurse #1 had never seen a diagnosis of "malingering" before in her career.

125.    Nurse #1 also spoke with corrections staff who stated that the Patient had been laying on his back in his cot since he returned from the hospital. She was told that the Patient "wiggled himself onto the floor" during the night and had been seen moving his extremities. Nurse #1's note states: "Talking with staff. Per COs [correctional officers] that were at the hospital, [Patient] changed his story every time doctors told him nothing was wrong." Consequently, before even seeing the Patient, Nurse #1 had formed the impression that the Patient was fabricating his illness and symptoms.

126.    Despite this information, and the fact that the Patient was considered a "high priority patient," Nurse #1 did not immediately check on the Patient or conduct any assessment of his condition upon the start of her shift. Instead, she waited until approximately 2:05 p.m. (over 2½ hours after the start of her shift) to make her first visit to the Patient's cell.[36]

### 3.   Nurse #1's "Evaluation" of the Patient

127.    Nurse #1's medical notes indicate that her first "visit" with the Patient was at 1:00 p.m. (This time is incorrect based upon video evidence which shows that Nurse #1 came to the room at 2:05 p.m.). Nurse #1's medical note reads as follows:

> Pt [Patient] seen in cell. Laying on bunk face up. Cell smelled like urine and feces. Pt [Patient] talking. Clearing his throat at times saying he's choking. Bouncing foot, knees, thighs, and hands at time wiggling hips back and forth stating he's trying to move and cannot. States he wants to shower but wants help sitting up. Pt [Patient] advised he needs to try himself. Reminded [him] ER imaging revealed no significant findings to causes immobility and incontinence. States he wasn't truthful as he thinks he has a[n] STD. Advised pt [Patient] STDs typically do not present in this manner and he can have those issues addressed when he's up and moving. Reports back pain/stiffness – reminded he needs to get up. Then states he was using drugs in the jail but wouldn't say more unless [I] came to him to help him up. Told [him] writer [Nurse #1] doesn't bargain. Told pt [Patient] [that] writer [Nurse #1] wants to do a UDS [urine drug screen]. Pt [Patient] calm. No fidgeting.

---

[36] Nurse #1 first appears at the door at 2:05:59 p.m. and stays until 2:08:39 p.m., less than three minutes

No SOB [shortness of breath]. No sweating. Will recheck tomorrow. ER called to
get full note.

128.    Notably, Nurse #1, an RN and MEnD's director of nursing, did not conduct an examination or full assessment of the Patient.  Contrary to her notes, video evidence documents that Nurse #1 did not examine the Patient at 1:00 p.m.[37]  Instead, Nurse #1 first appeared in the Patient's cell at 2:05 p.m. on September 1, 2018 – over 2½ hours after she arrived for her shift – despite the fact that the Patient was, by far, the patient with the most serious illness and despite the fact that the Patient spent the entire day prior in two emergency rooms.

129.    The video shows that, instead of conducting an examination of the Patient, Nurse #1 merely stood in the doorway of the Patient's cell, at a distance of at least ten feet, and spoke briefly with the Patient from across the room.  Her interaction with the Patient lasted less than three minutes.  From this brief and distant interaction, Nurse #1 drafted her medical note dated September 1, 2018, listing the time as 13:00 hours (1:00 p.m.).

130.    Nurse #1 admits that she did not conduct a formal nursing assessment of the Patient on September 1, 2018.  She did not check the Patient's vital signs, such as his blood pressure, blood oxygen saturation, or temperature.  She did not check his lung function or listen to his breath sounds with a stethoscope.  She did not conduct an assessment of his ability to stand or lift his arms, nor did she test his reflexes. Indeed, she did not touch him or come near him. Despite her notes to the contrary, from the distance that Nurse #1 stood (approximately ten feet away), there is no way that Nurse #1 could have assessed the Patient's ability to breathe or swallow; nor could

---

[37] The video exhibit captures everything occurring in the Patient's cell from 12:04 p.m. until 3:28 p.m. on September 1, 2018.

she have determined whether he was sweating.[38]  At no time does Nurse #1 assess the Patient's

hydration or nutrition.  Moreover, even though she notes that the cell "smelled like urine and

feces," she does not attempt to change the Patient's adult briefs or clean him.  In essence, Nurse #1

stood as far as possible from the Patient and provided him no care whatsoever in the two-minute

interaction she had with him that day.  According to Nurse #1's testimony, when the Patient

pleaded for assistance, she informed him that she would not "bargain" or "negotiate" with him.

She stated that she was "not coming into a room as a bargaining chip."

131.   Nurse #1's next entry in the medical narrative of September 1, 2018, indicated a

time of 1:50 p.m.  In that note she writes:

> CO [correction officer] called and they helped him sit up and he was able to hold
> himself up.

132.   However, Nurse #1 was not present when the correction officers came into the

Patient's cell at 12:04 p.m. and again at 2:31 p.m.  Nurse #1 admits that she never asked to review

any video footage of the Patient in his cell.  Thus, her medical note merely reflects what the

correction officers allegedly told her.

### 4.     Video Footage of the Patient: 12:00 p.m. – 3:30 p.m. September 1, 2018

133.   The video evidence shows what actually occurred during those two interactions

with correction officers.

134.   The video begins at 12:04 p.m. on September 1, 2018.  The Patient is lying on his

back in the cot; he is still wearing the orange jumpsuit from the day before.  His shirt is half off

his body.  An officer comes in at 12:05 p.m. and attempts to prop the Patient up against the wall

---

[38] The Administrative Law Judge urges the Board to carefully review the video evidence of
Nurse #1's interaction with the Patient and forward the information from this case to the Minnesota
Board of Nursing for violation of the Nurse Practice Act, if the Board has not done so already.

by putting a pillow between the Patient's head and the wall. The Patient is completely limp and his head is slumped down, with his chin resting on his shoulder. The officer then goes to the foot of the bed and pulls the Patient down by his feet so the Patient's head is not shoved up against the wall. The Patient appears semi-conscious and mostly unresponsive. The officer returns a few minutes later with a wheelchair and a lunch tray. The Patient does not react or attempt to eat or move. The Patient continues to lay on his back and does not change positions for over the next two hours. He appears to be in a sleep or unconscious state. His head is cocked to the side with his left ear on his left his shoulder. Occasionally, his feet, hands, and head twitch and jerk, but he does not change his sleeping position.

135.    At 2:05 p.m., Nurse #1 comes to the door of the cell and stays for approximately two minutes (as described above). The Patient appears semi-conscious and is moving his mouth. Two and a half hours later, the Patient has still not moved from his back; he remains on his back with his head cocked to the side.

136.    At 2:31 p.m., a correctional officer enters the room and walks back out. The officer returns with a second officer. The Patient does not move. One of the officers stands on the bed, straddling the Patient, and grabs the Patient's arms to lift him up to a semi-seated position. The other officer grabs the Patient's feet and swings them off the bed while the first officer holds the Patient up by his arms. The Patient is completely limp and not assisting the officers. Together, the officers then prop the Patient against the wall in a slouched, seated position. The officers remove the Patient's orange shirt and spend several minutes talking to the Patient, as he is slouched against the wall.[39] Eventually, the Patient slips down the wall and the two officers prop him up

---

[39] Recall that none of the videos contain sound and cannot be of assistance in determining what the officers or the Patient are saying.

again, this time to a more erect seated position against the wall. Then one of the officers grabs a urine sample jar and presents it to the Patient for a drug test.

137.   Once propped up the second time, the Patient has the strength to remain upright but has his back up against the wall. He is talking and nodding his head but not moving his arms from his sides. He appears in communication with the two officers for approximately 15 minutes, but because the video does not contain sound, it cannot be determined if the Patient's speech is slurred or if he is lucid. The officer with the urine sample cup places it in the Patient's hand. The Patient is unable to maneuver it to his pants.

138.   The officer pulls down the front of the Patient's pants slightly and places the Patient's hand in the waistband of his pants to apparently assist the Patient in placing the urine sample cup in his pants. The officer then leaves the room. The Patient wiggles his body but does not remove his hand from his pants. The Patient's hand remains in the waistband of his pants for the next half hour. The Patient eventually slides down the wall onto his right side (his hand still in his pants). A third officer comes into the cell and props the Patient up again against the wall and frees the Patient's hand from his pants. The Patient slides back down onto his side and again the officer comes in to prop him up against the wall. The officer grabs the Patient's hands and attempts to lift him, but the Patient slides to his side. The officer proceeds to prop the Patient up against the wall at least two more times. When it is apparent that the Patient is unable to sit up, the officer leaves the room, taking the wheelchair with him. The officer returns and pushes a walker toward the Patient, who is now slumped in the bed. The officer attempts to get the Patient to sit up and use the walker by placing the Patient's hands on the walker, but the Patient slumps over the walker while seated on the bed. The video ends at 3:28 p.m. on September 1, 2018.

139.   Nurse #1 admits that she did not see the Patient again that day.

140.   According to a report written by Sergeant #1, Nurse #1 advised Sergeant #1 that there was nothing medically wrong with the Patient and that correctional staff should not be assisting him with feeding, toileting, and other cares because the Patient was capable of doing those things himself "as he was medically cleared by the hospital."

141.   Sergeant #1 then called the Administrator to update her on the Patient's condition. Sergeant #1 left a message for the Administrator stating that MEnD medical staff instructed the jail staff that they should not be doing anything for the Patient because "there is nothing wrong with him medically." The Administrator returned Sergeant #1's call and directed, "if medical states there is nothing wrong . . . then go with it."[40]

### 5.   Nurse #1's Consult with Respondent: 5:30 p.m., September 1, 2018

142.   Nurse #1's notes indicate that at 5:30 p.m. she spoke with Respondent, after receiving the Patient's emergency room records from the hospitals. This was the first time that Nurse #1 reported to Respondent about the Patient.

143.   Nurse #1 read through the emergency room records with Respondent and ER Doctor #2's diagnosis of "malingering." Respondent noted that a diagnosis of "malingering" was quite "unusual."

144.   Respondent did not ask about the Patient's current vital signs. He did not ask her if she had completed an assessment of the Patient's reflexes or ability to stand. He did not ask if Nurse #1 had completed any type of neurological examination or assessment on the Patient. Instead, Nurse #1 only discussed the records from the hospital the day before, what jail staff had told her, and "her observations" of the Patient. Respondent did not instruct Nurse #1 to perform any assessments or tests on the Patient; nor did Respondent ask Nurse #1 to send him a full copy

---

[40] Ellipsis included in Sergeant #1's report. There is no content removed from the quote.

of the emergency room records so that he could review them himself. Instead, Respondent's only directive was that the Patient should be seen by a neurologist after the holiday weekend (i.e., after Tuesday, September 4, 2018). In order for a neurologist to see the Patient during the holiday weekend, MEnD staff would need to send him back to the hospital on an emergency basis. Respondent "did not even think" about sending the Patient back to the hospital; nor did Respondent call ER Doctor #2 to discuss the diagnosis of "malingering." Yet at this time, Respondent continued to have Guillain-Barre Syndrome on his mental list of "differential diagnoses."

145.    Respondent and Nurse #1 simply concluded that the Patient's symptoms and diagnosis of "malingering" were "puzzling" and "bizarre"

### 6.    Instructions to Correctional Staff

146.    Nurse #1 ended her shift at 5:45 p.m. on September 1, 2018. During her shift on September 1, 2018, Nurse #1's only visit with the Patient was when she stood at the door of his cell around 2:05 p.m. for approximately three minutes. Video footage evidences that Nurse #1 did not check the Patient's vital signs, examine the Patient, or provide the Patient any medical care on September 1, 2018.

147.    Before ending her shift that evening, Sergeant #1 instructed her replacement, Sergeant #2, that "medical stated that we didn't need to assist [the Patient] with anything as there was nothing medically wrong with him and he was capable of doing it himself."

148.    Similarly, two correctional officers[41] noted in their reports that at the evening shift turnover on September 1, 2018, the jailers were informed that the Patient "had been found medically sound and would be responsible for his own care until [the correctional officers] were

---

[41] The removal of the correctional officers' names, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.