of the emergency room records so that he could review them himself. Instead, Respondent's only

directive was that the Patient should be seen by a neurologist after the holiday weekend (i.e., after

Tuesday, September 4, 2018). In order for a neurologist to see the Patient during the holiday

weekend, MEnD staff would need to send him back to the hospital on an emergency basis.

Respondent "did not even think" about sending the Patient back to the hospital; nor did Respondent

call ER Doctor #2 to discuss the diagnosis of "malingering." Yet at this time, Respondent

continued to have Guillain-Barre Syndrome on his mental list of "differential diagnoses."

145.   Respondent and Nurse #1 simply concluded that the Patient's symptoms and

diagnosis of "malingering" were "puzzling" and "bizarre"

### 6.   Instructions to Correctional Staff

146.   Nurse #1 ended her shift at 5:45 p.m. on September 1, 2018. During her shift on

September 1, 2018, Nurse #1's only visit with the Patient was when she stood at the door of his

cell around 2:05 p.m. for approximately three minutes. Video footage evidences that Nurse #1 did

not check the Patient's vital signs, examine the Patient, or provide the Patient any medical care on

September 1, 2018.

147.   Before ending her shift that evening, Sergeant #1 instructed her replacement,

Sergeant #2, that "medical stated that we didn't need to assist [the Patient] with anything as there

was nothing medically wrong with him and he was capable of doing it himself."

148.   Similarly, two correctional officers[41] noted in their reports that at the evening shift

turnover on September 1, 2018, the jailers were informed that the Patient "had been found

medically sound and would be responsible for his own care until [the correctional officers] were

---

[41] The removal of the correctional officers' names, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

told otherwise." Later that evening, MEnD Medical Technician #1 advised a correctional officer that officers were not to be giving the Patient any medication until he was able to sit up and swallow on his own.

### I.     Sunday, September 2, 2018

#### 1.     Sunday Morning (8 a.m. to 10:15 a.m.)

149.    Nurse #1 started her next shift at the county jail on Sunday, September 2, 2018, at approximately 8:15 a.m. When she arrived, she found the Patient sitting in a wheelchair in the hallway by the medical cells. The correctional officers were planning on showering him because he was covered in his own excrement. Nurse #1 noted that the Patient's pants were urine soaked and urine was running out of the pantleg of the same orange scrubs that the Patient had been placed in for his transport to the hospital two days earlier (Friday morning, August 31, 2018). Nurse #1 asked the Patient if he was "incontinent" and he indicated that he was unable to ambulate to the toilet, which was why he had urinated on himself.

150.    One of the correctional officers told Nurse #1 that the Patient had spoken with his mother on Saturday and his mother told him "to knock this off." Nurse #1 understood this to mean, again, that the Patient was faking his symptoms.

151.    Nurse #1 observed that the Patient was sitting upright in the wheelchair on his own, with his hands in his lap, and holding his leg out such that his heels were lifted off the ground. When speaking with the Patient, Nurse #1 noted that he was talking out of the right side of his mouth. Her medical notes state: "[f]ace composure normal except when talking, he only used right side of mouth. As conversation progressed, he used both sides of mouth." Nurse #1 noted that the Patient licked both sides of his lips with his "full tongue."

152.   The Patient stated that he was thirsty and that he tried to eat and drink but could not. Nurse #1 obtained a juice box with a straw. At first the Patient declined to drink, but Nurse #1 insisted that he drink. The Patient was unable to hold the juice box, so Nurse #1 poured the juice into his mouth. While Nurse #1's medical note states that the Patient "swallowed" the juice, she also noted that she heard a "gargle" in his throat. The Patient expressed that he was choking, but Nurse #1 did not believe it because she thought she saw him swallow the juice.

153.   Nurse #1 agreed with the correction officers that the Patient should be bathed, so she directed that he be placed in a restraint chair and wheeled into a shower stall. According to her notes, this method was the "best plan w[ith] available resources."

154.   There is no video footage of Nurse #1's exchange with the Patient in the hallway because the Patient was located outside of the medical surveillance cell.[42]

155.   Video footage of the Patient, prior to Nurse #1's arrival that morning and after Nurse #1's interaction with the Patient in the hallway at approximately 8:30 a.m., portrays the Patient's actual condition and contradicts the description in Nurse #1's medical notes.

### 2.   Video Footage of the Patient from 6:00 a.m. to 12:00 p.m. (September 2, 2018)

156.   The video begins at 6:00 a.m. and shows the Patient laying on his back on a thin blue mat on the concrete floor of his medical segregation cell (cell #214). He is still shirtless from when the officers removed his orange scrub shirt the day before (September 1) and he is still in the

---

[42] Although such video may have existed at one point in time, upon subpoenaing the county jail for such video of the hallway outside of cell 214 and 215, the county jail responded that it had already produced all videos of the relevant timeframe and if the video was not on the hard drive it had produced, then it no longer existed.

This footnote has been added consistent with Committee Exception #4. The revision to this Finding of Fact is consistent with the information considered by ALJ O'Reilly.

same orange scrub pants that he was placed in for his transport to the hospital two days earlier (August 31). There is a walker and a tray of food beside him from the night before that appears undisturbed. His legs are limp, but he is able to roll his head from side-to-side and shake his arms and hands in a non-purposeful manner. He remains lying on his back the entire time and does not change positions.

157.    At 7:43 a.m., a correction officer enters the cell with another tray of food and removes the tray from the day before. The officer places the new tray on the bed, out of reach of the Patient, who is lying on the floor. The Patient does not move when the officer is in the room.

158.    The Patient remains in the same position – on his back – for over two hours (until 8:18 a.m.) when a correction officer comes into the cell and drags the Patient out of the room by grabbing the mat beneath the Patient and dragging it through the cell door, into the hallway, outside of the camera range. The Patient is dragged out of the cell around the same time that Nurse #1 arrives for her shift that day (Nurse #1 clocked in at 8:16 a.m.). (Recall that Nurse #1 found the Patient in the hallway at approximately 8:30 a.m.)

159.    Once the Patient is out of the cell, a jail employee comes in to mop and clean the cell. The employee mops the floor twice. The employee brings in a new white mat for the cot and a new pillow, but later removes the white mat, leaving the pillow on the bed.

160.    At approximately 8:40 a.m., the correction officers take the Patient to holding cell #222 to perform a sponge bath. Video footage from that cell depicts the officers wheeling the Patient into the cell in a wheelchair. The Patient is still in the orange scrub pants and is shirtless. He is sitting upright with his hands in his lap. Using a bucket of water and some towels, an officer wipes down the Patient's upper body. The Patient does not assist in any way by lifting his arms, etc.

161.    Two additional officers enter the cell at 8:55 a.m. and the three officers lift the Patient out of the wheelchair and place him on the concrete floor. They proceed to remove his pants and adult brief and sponge wash his body. The officers roll the Patient over and wash his back side, return him to the wheelchair, and roll him out of the cell.

162.    The Patient is brought back to the medical segregation cell (#214) at 9:07 a.m. He is naked in a wheelchair, with a blanket draped over him. Two officers wheel him into the room and one starts wiping the Patient down with a towel, as the Patient sits, unassisted, in the wheelchair. The Patient's hands are in his lap, his feet are on the ground, he is sitting upright in the chair, and he wiggles his torso a bit, although he does not make any movement to assist the officer who is wiping him down with a towel.

163.    A blue mat – like the one that the Patient was lying on when he was dragged out of the cell – is brought into the cell. A third officer enters the cell and the three officers, together, lift the Patient out of the wheelchair and lay him on the mat. They throw a hand towel over the Patient's groin and roll the wheelchair out of the room.

164.    While the Patient is able to shake his arms and hands in a random manner, he does not assist the officers when they are moving him. He remains completely limp. The officers roll the Patient to his side and towel off his back side then return him to his back.

165.    It takes all three officers to place the Patient in a new adult brief. The officers lift him up by his legs and put a blue pair of scrub pants and socks on him, but they do not put him in a shirt. The Patient remains limp and shirtless, and he does not assist the officers when they are moving, bathing, diapering, or clothing him.

166.    The officers then lift the Patient by his arms and legs to place him more squarely on the mat on the floor. They place a pillow under his head, a blanket over his body, and a tray of

food at his side on the floor. The Patient remains on his back and does not change positions throughout the remainder of the videos, which end at noon. The Patient does not move his legs, but randomly moves his arms and hands in a limp and listless manner.

167.   At one point, around 10:12 a.m., the Patient appears to try and touch a juice box from the tray located on the floor alongside his body. While the juice box is loosely in or near the Patient's hand (resting on the floor), the Patient does not attempt to lift or control it in any manner. Periodically, the Patient twitches his right arm and hand, and shakes his head back and forth, but the Patient does not change positions or move from his back.

168.   At approximately 10:39 a.m., the Patient spits a white substance from his mouth onto the pillow, which remains on his pillow until 11:38 a.m., when a correction officer enters the cell, flips the Patient's pillow over to hide the excretion, and uses toilet paper to wipe the white substance from the Patient's mouth. The officer then leaves the room.

169.   At 11:51 a.m., another correction officer comes in the cell with a new tray of food, which he places beside the Patient on the floor. The officer takes away the plate of food that was left there for breakfast. The video ends at approximately 12:00 p.m.

170.   While the videos of the Patient in the medical segregation cell and shower cell were available to Nurse #1 upon request, she did not ask to review any video of the Patient to evaluate his condition. In addition, because Respondent was located outside of the secured facility, he did not have access to the videos.

### 3.   Nurse #1's Second Observation and Consultation with Respondent (11:00 a.m.)

171.   Nurse #1's next note in the Patient's medical records is dated September 2, 2018, at 11:00 a.m. In that note, Nurse #1 writes:

Pt [Patient] was showered by officers who cleansed perineum. He had been placed in an adult brief. Laying on mattress on cell floor. Apple juice in hand. Updated [Respondent]. Spoke to [Sergeant #1]. COs [correction officers] to use straws to assist him with drinking periodically and meals. Will recheck tomorrow.

172.   Nurse #1's note is in stark contrast to what appears in the videos of the Patient from 8:00 a.m. to noon that day. While Nurse #1's 11:00 a.m. note would make it appear that she provided some type of care or assessment of the Patient at 11:00 a.m., she, in fact, did not. Rather, Nurse #1 merely "peeked onto his cell" from the one-foot-by-one-foot window in the door at approximately 11:00 a.m. for approximately "ten seconds or less."

173.   According to Nurse #1's trial testimony, when she looked in on the Patient from the small cell window at approximately 11:00 a.m., he was "laying comfortably" and had a juice box in his hand. In reality, around the time Nurse #1 created her 11:00 a.m. note, the Patient appeared to be unconscious[43] on the floor of his cell, excreting a white substance from his mouth, which appears on his pillow from 10:39 a.m. to 11:38 a.m., for nearly an hour.

174.   Nurse #1 consulted with Respondent by telephone at approximately 11:10 a.m. on September 2, 2018, to discuss the Patient. Like the day before, Nurse #1 had not taken the Patient's vital signs or conducted any formal examination or assessment of the Patient on September 2, 2018. In addition, Respondent did not ask Nurse #1 for the Patient's vitals, he did not instruct her to conduct an assessment or examination, and did not ask her to obtain any other information about the Patient. Instead, Respondent instructed her to continue monitoring the Patient. Based upon the information that he obtained from Nurse #1, Respondent did not believe that the Patient's condition warranted a return to the hospital that day.

---

[43] This Finding of Fact has been revised consistent with Committee Exception #5. The revision to this Finding of Fact is consistent with the evidence presented at the hearing.

### 4.    Nurse #1's Final Observation of the Patient (2:00 p.m.)

175.    At approximately 2:00 p.m., Nurse #1 conducted a final "check" on the Patient. She did this again by merely "peeking in" through the one-foot-by-one-foot window in the Patient's jail cell door.  In the ten seconds or less that she observed the Patient, she noted that the Patient was lying on his back "sleeping comfortably" and that drool was rolling down his cheek. From her position outside the room, she concluded that the Patient "was breathing normally." Nurse #1 did not enter the room, did not attempt to communicate with the Patient, did not check the Patient's vital signs, and did not conduct any assessment on the Patient.  Nurse #1 also had no idea when the Patient had eaten his last meal.  Instead, Nurse #1 simply ended her shift.

176.    In sum, at no time, during either of her shifts on September 1 or 2, 2018, did Nurse #1 check the Patient's vital signs or conduct a formal nursing assessment on, or physical examination of, the Patient.  Nurse #1's only interaction with the Patient on September 1 and 2, 2018, involved: (1) standing in the doorway of his cell for approximately three minutes at around 2:00 p.m. on September 1, 2018; (2) encountering the Patient in the hallway (outside of available[44] video coverage) at approximately 8:15 a.m. on September 2, 2018; and (3) peeking in the small window of the Patient's cell at 11:00 a.m. and 2:00 p.m. on September 2, 2018.

177.    Nurse #1 ended her shift on September 2, 2018, at 2:27 p.m.  Before leaving, Nurse #1 gave the following instructions to jail staff:

> Nurse [#1] advised that staff were to assist [the Patient] with drinking fluids regularly by using a straw to the mouth.  She also said that we should help [the Patient] with feeding even if it was broth through a straw.  Nurse [#1] also stated that we should change his briefs as needed.  She went on to state that if [the Patient] isn't re[-]positioning himself, that staff should change his position and to use a blanket if necessary to re-position him.

---

[44] This Finding of Fact has been revised consistent with Committee Exception #6. The revision to this Finding of Fact is consistent with the evidence presented at the hearing.

178.    Surveillance video depicts the Patient laying on a mat on the floor of his cell for the remainder of the afternoon. He does not change positions from his back. His right arm twitches periodically and his head moves from side to side. At 2:55 p.m., a white substance can again be observed coming out of his mouth. By this point, Nurse #1 had already left the facility for the day.

### 5.    The Patient's Death: 5:22 p.m.

179.    At 4:46 p.m., a correctional officer enters the Patient's cell to bring him dinner. The Patient is still laying on the floor, unable to speak or sit up. The correction officer spends several minutes standing over the Patient attempting to talk to him, but the Patient remains unresponsive. The officer attempts to lift the Patient to a sitting position by grabbing him by the arms and pulling him up, but the Patient's body is completely limp. A second correction officer then comes into the cell to help prop the Patient up against a plastic storage container. The Patient's head falls straight back, as if completely lifeless, and the officers lie him down again. The officers roll the Patient onto his side and a third officer enters the room.

180.    At 4:52 p.m., MEnD Medical Technician #1 enters the room with a cart to take the Patient's vitals. The officers and Medical Technician #1 were unable to get a blood pressure. The Patient's pulse rate, which, at first, measured 66 BPM, became undetectable. Neither Medical Technician #1 nor the officers attempt CPR or other lifesaving measures. At 4:58 p.m., officers came in with an Automated External Defibrillator (AED) and started chest compressions. Paramedics were called and arrived at 5:01 p.m. CPR was attempted by the paramedics but was unsuccessful. The Patient was pronounced dead at 5:22 p.m.

6.    **Notification of Death**

181.    Nurse #1 was on her drive home when she received a call from Medical Technician #1 notifying her that the Patient had died.  She then called Respondent to advise him of the Patient's death.

182.    At 8:07 p.m. on September 2, 2018, shortly after the Patient was pronounced dead, Sergeant #2sent an email to all correctional staff at the county jail stating:

> Anybody who had contact with [the Patient] needs to write a report under ICR# 1800969 that is created.  Document all contact physical and verbal.  This is a private incident and no information should be given out to anyone from the public including family members and should not be talked about outside the facility.

> Holding cell 214 is sealed as a crime scene until an autopsy is complete on the inmate that was in there.  No one is allowed in there for any reason at all. Everything in there including the AED is part of the evidence scene.  [An] [i]nvestigator [. . .][45]has left us his AED which is in 2nd floor control by the stairwell to have in the meantime.  There is one still located in the first floor control as well. Lead investigator is[. . .][46] from the PD, once he gives the ok, the room can be cleaned up and put back in use.

. . .

183.    Twenty-four supplemental reports were prepared by county jail staff; 18 were written in the days following the Patient's death on September 2, 2018, and six were written on September 2, 2018.

184.    Medical Provider #1 returned to work at MEnD on September 4, 2018, the Tuesday after Labor Day, to learn that the Patient had died on Sunday, September 2, 2018.  Medical Provider #1 heard Respondent talking to his attorney on the telephone about a death at the county jail and she inquired more from Respondent.  Respondent advised Medical Provider #1 to "not

---

[45] The removal of the investigator's name is a non-substantive change made to conform with the Board's standard format in its past orders.

[46] The removal of the lead investigator's name is a non-substantive change made to conform with the Board's standard format in its past orders.

jump to conclusions because it could impact the company." Respondent stated that the Patient probably "did this to himself" by giving himself a blood clot from faking an illness or perhaps stuck a sock down his own throat.

185. "Horrified" by what she described as the "neglect" and "incompetency" she witnessed from county jail and MEnD medical staff, Medical Provider #1 tendered her resignation[47] from MEnD that same day. In her mind, Medical Provider #1 believed she witnessed a "murder." Medical Provider #1 contacted several state agencies to report what she witnessed, including the Department of Corrections. She never heard back from the Department of Corrections.

186. To Nurse #2's knowledge, Respondent never asked for nursing notes or jail video footage after the Patient's death.

187. It is undisputed that Respondent did not have access from outside the jail to view the surveillance footage of the Patient in the medical segregation cell and that Respondent did not perform any evaluation of the Patient on his own. Respondent relied upon the assessments and observations of his on-site medical staff and the emergency room records from the hospitals, as described to him by Nurse #1.

188. It is not uncommon, in the system of correctional medicine, that a physician is not on-site at all times to evaluate inmates and must rely on the observations and evaluations conducted by on-site medical staff, correctional officers, and other medical professionals outside of the correctional facility who conducted their own assessments.

---

[47] This Finding of Fact has been revised consistent with Committee Exception #7. The revision to this Finding of Fact is consistent with the evidence presented at the hearing.

189.   Respondent notes that, after the Patient's death, MEnD practices give more scrutiny to reports by correctional officers. MEnD training now emphasizes the importance of assessments, evaluations, and the taking of vital signs.

190.   No adverse action was taken by MEnD against any of the employees involved in the Patient's care. In an interview with the Attorney General's Office after the Patient's death, Respondent stated that he "was very proud of the way [Nurse #1] handled the case" by "car[ing] for this patient" and "provid[ing] dignity for him."

### III.   Cause of Death

191.   An autopsy was performed on the Patient by the Ramsey County Medical Examiner ("Medical Examiner"),[48] on September 4, 2018. The Medical Examiner made two "anatomical diagnoses": (1) pneumonia; and (2) cerebral edema. The Medical Examiner made no determinations as to the cause of death or manner of death in his report. The preliminary findings note "no anatomic cause of death." The toxicology report identifies only the presence of only Delta-9 THC and no other drugs or controlled substances.

192.   Expert #1[49] is the Chief Medical Officer and Vice President of Medical Affairs at a metropolitan hospital[50] in Minnesota. He received his Bachelor of Science and medical degrees from the University of Minnesota and completed a residency in neurology at the University of Minnesota Medical Group. He has served as an Assistant Professor of Neurology and the Director

---

[48] The removal of the Ramsey County Medical Examiner's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[49] The removal of Expert #1's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[50] The removal of the health organization's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

of a Neurology Clinic in the Twin Cities;[51] the Head of the Department of Neurology at a hospital[52] in Fargo, North Dakota; and the Head of Neurology and Medical Director of the Neurosciences Division of a medical group[53] in Minnesota.

193.    Prior to serving as the Chief Medical Officer for a metropolitan hospital, Expert #1 practiced for 15 years as a general neurologist.  He has researched and taught on numerous neurological topics, including Guillain-Barre Syndrome, a rare autoimmune disorder in which a person's own immune system damages the nerves, causing muscle weakness and sometimes paralysis.  In rare instances, especially when medical treatment is not timely provided, Guillain-Barre can be fatal.

194.    Expert #1 opined that the Patient most likely died of respiratory failure caused by Guillain-Barre Syndrome.  Expert #1's expert opinion is based upon his review of the record, including MEnD and emergency room medical records, the Ramsey County Medical Examiner's Report, and surveillance video of the Patient included as Exhibit 112 to this hearing record.

195.    According to Expert #1, Guillain-Barre Syndrome's "only clinical findings are typically an ascending weakness," starting in the legs, working up to the face, and affecting internal organs.  This ascending muscular weakness can ultimately affect the lungs and prevents them from functioning, resulting in death by respiratory failure.

196.    Guillain-Barre is largely a clinical diagnosis, although a spinal tap can be used to confirm the disease.  This is what makes Guillain-Barre difficult to diagnose by medical personnel.

---

[51] The removal of the health organization's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.
[52] The removal of the health organization's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.
[53] The removal of the health organization's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

Generally, a family practice physician who recognizes signs of Guillain-Barre will refer a patient to a neurologist for further evaluation and diagnosis.

197.   Symptoms of Guillain-Barre include pain and discomfort (including in the chest and back); tingling in the extremities; progressive muscle weakness; difficulty speaking, breathing, and swallowing; excessive sweating; erratic blood pressure; facial drooping; difficulty moving extremities; inability to stand or ambulate; and paralysis. These symptoms are progressive and can fluctuate. Ways to identify if a patient is feigning symptoms include evaluating a patient's mobility and ability to stand, and "teasing out" attempts to falsely exhibit weakness.

198.   Because lungs are generally able to exchange oxygen until they are extremely weak, patients who suffer from Guillain-Barre can have normal blood oxygen saturation levels up until the patient's lungs become completely paralyzed by the disease. When the paralyzing weakness reaches the lungs, death can occur quickly if ventilatory support is not provided. In most cases, patients with Guillain-Barre are able to be treated before this happens. If the disease has progressed to the lungs, patients who receive medical care can often be intubated in an intensive care unit to avoid death until the patient's immune system is able to recover through medical treatment. However, in rare cases, individuals have died due to the progressive paralysis associated with Guillain-Barre that ultimately affects the respiratory system and stops the patient from breathing.

199.   Guillain-Barre Syndrome is survivable with appropriate medical care and most patients are able to recover from the disease and live normal lives. In approximately one-third of patients diagnosed with Guillain-Barre, the disease stops progressing on its own and does not require extensive medical treatment; another one-third of the patients suffer more extensive paralysis and weakness requiring medical intervention; and approximately one-third require

ventilation to assist with breathing while their immune systems recover. Of the one-third of patients who are intubated, approximately ten percent do not recover and end up dying from the disease.

200. Expert #1 opined that, at 27 years old, the Patient would have had a better chance of surviving had he received proper medical treatment. In other words, appropriate and timely medical intervention may have saved the Patient's life.

201. Guillain-Barre is a relatively rare illness, but due to the risk of disability and death, it is a well-known neurological disease to trained neurologists. It is not, however, widely known to non-medical personnel and even physicians can miss the diagnosis, particularly if they believe there could be another explanation for the generalized weakness the patient is experiencing. This type of preconceived notion is referred to as "anchoring bias" and can affect a provider's ability to diagnose illness. In this case, the jailers and medical providers – including those at the two emergency rooms– believed the Patient may have been feigning his illness in an attempt to manipulate staff or orchestrate an escape. Therefore, they were unlikely to recognize the symptoms as part of a serious illness or diagnose it as Guillain-Barre.

202. Malingering is a rare diagnosis but is more common when a physician cannot determine the cause of the symptoms and a patient has "secondary gain" by feigning illness; for example, an inmate attempting to get out of the jail or an employee who wants to get out of work. Expert #1 was not surprised that the emergency room doctors did not include Guillain-Barre Syndrome as a possible cause of the Patient's illness because they did not have full information as to the progression of the symptoms.

203. Expert #1 did not testify as to the reasonable standard of care, but rather, testified to the probable cause of the Patient's death. He did, however, note that doctors must frequently

rely on others to provide information, including nursing reports and emergency room records. That being said, physicians must also exercise their own judgment and discretion, which may include an obligation to instruct staff to obtain more information.

204.    Unlike Respondent, Expert #1 reviewed the video surveillance footage of the Patient in the days prior to his death. Expert #1 noted that these videos, depicting the progressive nature of the Patient's symptoms, helped him to reach his opinion as to the cause of the Patient's death.

## IV.    Complaint Made to the Board of Medicine

205.    On September 5, 2018, an individual sent a letter to the Ramsey County Medical Examiner's Office expressing concern about the care provided to the Patient by Respondent prior to the Patient's death. A complaint was filed with the Board around that same time.

206.    The Complaint Review Committee advised Respondent of the complaint on or around September 14, 2018, and permitted him an opportunity to respond in writing. Respondent timely filed his response on October 19, 2018. Respondent's response included: Respondent's narrative of the events involving MEnD's care of the Patient in August and September 2018; MEnD's records for the Patient's care while in the county jail; supplemental reports prepared by county jail correctional officers; and the Patient's autopsy report.

207.    On November 7, 2019, the Board issued a Notice of Conference commanding that Respondent appear before the Complaint Review Committee to discuss the allegations contained in the complaint filed against him.

208.    Respondent appeared before the Complaint Review Committee for the conference on December 9, 2019.

209.     On August 18, 2020, the Committee issued a Notice and Order for Prehearing

Conference and Hearing, thereby initiating this contested case proceeding.

## V.     Expert Medical Testimony

### A.     Expert #2,[54] Committee Expert

210.     Expert #2, M.D., is a physician who has been licensed to practice medicine in the

state of Minnesota since 1986.  He graduated from St. Olaf Collage with a bachelor's degree in

Chemistry in 1981 and earned his medical degree from the University of Wisconsin-Madison

Medical School in 1985.  He completed his residency in family medicine in 1988 and is certified

by the American Board of Medical Specialties in family medicine.

211.     Expert #2 is currently a full-time hospitalist.[55]  He is the current lead hospitalist and

former Chief of Staff at a hospital in[56] Minnesota.  He is also the chair of the Professional Practice

Evaluation and Improvement Committee at that hospital, where he reviews the work of other

physicians.

212.     Expert #2 also serves as the medical director for a residential facility.[57]  In that

position, he supervises medical and clinical staff remotely, similar to the type of medical director

responsibilities that Respondent was charged with performing for MEnD in 2018.

213.     Prior to joining the Minnesota hospital where he is currently employed, Expert #2

served as a hospitalist and hospitalist medical director for a Minnesota clinic, the Chief Medical

---

[54] The removal of the Expert #2's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[55] A hospitalist is a doctor who provides care for patients at a hospital.  Hospitalists specialize in providing hospital care, but also maintain their medical specialty.  In Expert #2's case, he maintains his specialization in family medicine.

[56] The removal of the health organization's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[57] The removal of the residential facility's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

Officer for a medical group,[58] and a family practice physician at a family practice clinic.[59] In sum, Expert #2 has 36 years of practice in family medicine.

214.    The Board of Medical Practice Complaint Review Committee hired Expert #2 to evaluate Respondent's work in this matter and provide expert testimony as to the minimal standards of acceptable and prevailing medical practice and Respondent's compliance with the ethical requirements set forth in Minn. Stat. § 147.091.

215.    In preparing his expert medical opinion, Expert #2 considered: the letter to the Ramsey County Medical Examiner (Ex. 121); the Notice and Order for Prehearing Conference and Hearing (August 18, 2020); Respondent's written response to the Board (Ex. 111); MEnD medical record from August 25 to September 2, 2018 (Ex. 111); the emergency room records from September 1, 2018 (Ex. 111); the Ramsey County Medical Examiner's Report (Ex. 111); Expert Witness Affidavits and Reports from four physicians[60] (not in the record); the county jail correction officers' supplemental reports (Ex. 111); the MEnD Medical Services Agreement with the county (Exs. 100, 101); MEnD's Nursing Policy/Procedure for "Emergency Response to Detainees (Ex. 104); the transcripts of the Attorney General interviews with Medical Provider #1(Ex. 122) and Respondent (Ex. 123); the Minnesota Department of Corrections' Findings (May 15, 2020) (not in the record); the Transcript of the December 9, 2019, Board Conference with Respondent (Ex. 126); the county jail surveillance videos from August 24, 29, 30, 31, Sept. 1 and 2, 2018 (Ex. 112); and a video of the Fox 9 News report on the Patient's death (not in the record).

---

[58] The removal of the medical group's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[59] The removal of the clinic's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

[60] The removal of the four physicians' names is a non-substantive change made to conform with the Board's standard format in its past orders.

216.    Notably, unlike Respondent, Expert #2 reviewed the surveillance video of the progression of the Patient's illness and not simply the descriptions by MEnD staff. In rendering his expert opinion, however, Expert #2 did not know that Respondent had not viewed the videos of the Patient's illness as it progressed. Expert #2 noted that the surveillance videos were important in reaching his expert opinions.

217.    Upon review of Respondent's actions in this case, Expert #2 concluded that Respondent failed to conform to the minimum standard of care as a family physician by:

(1)    Failing to recognize a serious medical condition and ensure the timely transfer of the Patient to the emergency room on August 30, 2018;

(2)    Failing to obtain basic medical information from Nurse #1 on September 1 and 2, 2018, including vital signs and basic nursing assessment results; and

(3)    Failing to return the Patient to the hospital for an emergency neurological evaluation on September 1 and 2, 2018.

218.    Expert #2 further opined that, by failing to conform to the minimum standard of care on these occasions, Respondent carelessly disregarded the Patient's health, welfare, or safety and created unnecessary danger to the Patient's life, health, or safety.

### 1.    Failing to Insist on Emergency Care on August 30, 2018

219.    In his expert report, Expert #2 opined that when Respondent learned that the Administrator had overruled his directive to send the Patient to the emergency room on August 30, 2018, Respondent should have contacted the Administrator on his own accord and insisted on transferring the Patient to the hospital for care.[61]    Instead, Respondent did not contact the

---

[61] The Committee did not solicit testimony from Expert #2 on this topic so the Administrative Law Judge relies on Expert #2's expert witness report, which was the subject of cross examination by Respondent's legal counsel.

Administrator himself and decided to wait until the next day because a MEnD medical provider was scheduled to make rounds at the jail that next morning.

220.    According to Expert #2, Respondent "willfully abrogated" his responsibility for the Patient's medical care to a non-medical administrator. This not only failed to meet the minimal standard of acceptable and prevailing practice, it demonstrated a careless regard for the Patient's health, welfare, or safety and caused an unnecessary danger to the Patient's health and life.

### 2.    Failing to Obtain Basic and Necessary Medical Information

221.    In rendering his expert opinions in this case, Expert #2 uses his own experience as a residential facility medical director, where he must frequently rely on the assessments and observations of his medical staff (i.e., nurses and clinical staff) who are bedside with the patients.

222.    Expert #2 explained that when a supervising physician is working remotely, the doctor is dependent upon those at the patient's bedside for information. That is why the doctor has a duty to ask the right questions of the medical staff and ensure that staff are conducting the tests and assessments to obtain the information necessary for a doctor to make treatment decisions.

223.    The preliminary and most basic type of objective information that a doctor should evaluate is a patient's vital signs, which are simple to take and can easily vary, thereby signaling a change in the patient's medical condition. According to Expert #2, vital signs are the "earliest warning signs" of an illness.

224.    Because vital signs can change quickly and dramatically, even if vitals have been taken from a patient days or hours earlier, it is important that a doctor have available to him the most current patient vital signs. Thus, the fact that the Patient's vital signs were taken at the hospital on August 31, 2018, did not relieve Respondent from his obligation to ask Nurse #1 for the Patient's current vital signs on September 1 and 2, 2018, when the Patient's condition was

worsening. Respondent did not, but should have, asked Nurse #1 for those vital signs and, if she did not have those results, instruct Nurse #1 to obtain that basic information.

225.    Similarly, Respondent should have inquired of Nurse #1 about the type of standard nursing assessments that she had personally performed on the Patient on September 1 and 2, 2018. Given the Patient's symptoms, the prevailing standard of care required Respondent to ask Nurse #1 if she had assessed the Patient's most basic neurological functions, such as independently testing the Patient's ability to speak, stand, walk, and swallow, and testing his motor and muscle strength. According to Expert #2, the minimal standard of care required Respondent to ask Nurse #1 "probing questions," such as "can [the Patient] lift his arms?", "can he feed himself?", "can he swallow," "can he stand or walk on his own?", and "what is his muscle strength?". This was especially true where, as here, correctional officers were providing conflicting reports of the Patient's physical abilities. Hence, a nursing exam was critical for Respondent to fully evaluate whether the Patient's symptoms were getting worse. Respondent's failure to ask the necessary questions and obtain critical medical information from Nurse #1 negatively impacted Respondent's ability to fully evaluate the Patient and get him the emergency medical assistance he needed to save his life.

226.    Expert #2 noted that a reasonable doctor, when presented with conflicting information regarding a patient's symptoms, would want to do their own assessment on the patient. In Expert #2's words, "I have to lay eyes on them myself. I have to do my own assessment if I'm getting mixed reports from the staff."

227.    Expert #2 concluded that, by not obtaining vital signs from the Patient on September 1 and 2, 2018; by not asking Nurse #1 whether she had taken the Patient's vital signs; by not inquiring of Nurse #1 whether she had conducted her own basic nursing assessment; and

by not instructing Nurse #1 to conduct a basic nursing assessment of her own on the Patient, Respondent failed to conform to the minimal standard of acceptable and prevailing practice. Expert #2 further determined that Respondent's inactions demonstrated a careless disregard for the Patient's health, welfare, and safety, and created unnecessary danger to the Patient's life, health, and safety.

### 3.   Failing to Return the Patient to the Emergency Room on September 1 and 2

228.   According to Expert #2, even though the Patient had been seen in two hospitals on August 31, 2018, the minimum standard of care required that Respondent send the Patient back for emergency care on September 1 and 2, 2018, due to the worsening of the Patient's condition.

229.   Expert #2 explained that a diagnosis of "malingering" is a highly unusual diagnosis that he has never encountered in his career. Consequently, a reasonable doctor should have a "high level of skepticism" when such a diagnosis is made by another physician. Malingering is a diagnosis of exclusion (a conclusion reached when all other options are ruled out). Therefore, a reasonable doctor would dig deeper to evaluate the symptoms to find a different root cause, especially when the symptoms were not resolving or relenting. Expert #2 noted that many of the Patient's symptoms were things a patient would have significant difficulty faking, such as a facial droop, and hard to keep up, such as soiling oneself repeatedly and being unable to stand or walk. According to Expert #2, each of these indicators would be "pretty unusual behavior for someone to exhibit as faking."

230.   The minimum standard of care requires that a physician use his own judgment and discretion to evaluate a patient and not rely on diagnoses made by other physicians. This is especially true when another doctor makes a diagnosis of malingering. A reasonable doctor must think critically and independently evaluate a patient's symptoms, especially if the symptoms are

progressing from the time of the other doctor's diagnosis, as was the case here.  It is the responsibility of the supervising physician to seek the assistance of experts and order the necessary tests or assessments to treat and diagnose a patient.  If this requires transfer to an emergency room, as in the case at hand, Respondent had that obligation.  According to Expert #2, as the attending physician, Respondent was ultimately responsible for the Patient's care and "the buck stop[ped]" with Respondent.

231.  Expert #2 opined that ER Doctor #2's evaluation of the Patient at the hospital was not comprehensive enough because it appears that the Patient was in four-point restraints the entire time (except for when he underwent the MRI).  Therefore, this should have raised flags for Respondent as to the validity of the malingering diagnosis.

232.  Expert #2 further noted that the discharge instructions from the emergency room warned that the Patient should return to the hospital if he showed signs of "worsening weakness, difficulty standing, paralysis, loss of control of the bladder or bowels, or difficulty swallowing." Yet, even though the Patient was exhibiting all of these symptoms after he returned from the emergency room, Respondent failed to recognize the fact that the Patient's condition was worsening and that the Patient needed emergency care.  The reason why Respondent was not realizing that the Patient's condition was worsening and that he required emergency care was because Respondent did not ask the necessary questions of his on-site medical staff or insist that basic tests and nursing assessments be performed (see above).

233.  Expert #2 explained that, while Respondent directed Nurse #1 to schedule the Patient for a neurological appointment after the holiday weekend (i.e., sometime after September 4, 2018), that directive was insufficient, given the emergent needs the Patient was

exhibiting on September 1 and 2, 2018. The only way that the Patient was going to obtain a neurological evaluation before September 4 was to return the Patient to the emergency room.

234.    In addition, even though Respondent did not talk with Nurse #1 until late in the day on September 1, 2018, he still had the obligation to order the Patient's transport to the emergency room either that night or the next day when Respondent spoke with Nurse #1 again. However, because Respondent did not ask the pertinent questions or ensure that the necessary information was obtained and assessments performed, he unreasonably failed to realize that the Patient's illness had progressed.

235.    Expert #2 opined that had the Patient been sent back to the emergency room on September 1 or 2, 2018, he may have been able to receive the life-saving treatment he needed (for example, ventilation). As Guillain-Barre Syndrome is treatable in most cases, it could have been a lifesaving measure for the Patient.

236.    Expert #2 concluded that Respondent failed to conform to the minimal standards of acceptable and prevailing practice when he failed to have the Patient transferred to the emergency room again on September 1 or 2, 2018, and that this failure demonstrated a careless disregard for the Patient's health, welfare or safety and created unnecessary danger to the Patient's life, health, and safety.

**B.    Expert #3,[62] Respondent's Expert**

237.    Expert #3, M.D., is a is physician who has been licensed to practice medicine in the state of Minnesota since 2008. He obtained a Bachelor of Science degree from the University of Minnesota in 2001 and his medical degree from the University of Minnesota Medical School in

---

[62] The removal of Expert #3's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

2005. He completed his residency in family medicine in 2008 and is certified by the American Board of Medical Specialties in family medicine.

238.    Expert #3 is currently a family practice physician at a clinic in Minnesota.[63] In his position with the clinic, Expert #3 has held various leadership positions, including President of the clinic, member of the clinic's Board of Directors, member of the Clinic Leadership Council, and Director of Performance Improvement. He also previously served as the Chief of Staff of a county hospital.[64]

239.    Expert #3 was retained by Respondent to provide expert opinion as to the minimal standards of acceptable and prevailing medical practice. Expert #3 acknowledges, however, that he is not familiar with the Minnesota Medical Practice Act, Minn. Stat. §§ 147.001-.381 (2020), or the requirements set forth therein.

240.    In preparing for his testimony, Expert #3 reviewed the Patient's MEnD medical records from August 25 to September 2, 2018 (Ex. 111); the emergency room records from September 1, 2018 (Ex. 111); the Ramsey County Medical Examiner's Report (Ex. 111); and the Expert Witness Affidavits and Reports from Expert #1 (Ex. 119) and Expert #2 (Ex. 120).

241.    Expert #3 did not review the video surveillance footage of the Patient entered into the hearing record as Exhibit 112. As a result, Expert #3 did not observe the Patient's actual condition, the symptoms he was displaying, and the progression of his illness, which would have been apparent to MEnD staff and, in particular, to Nurse #1, during the final days of the Patient's life.

---

[63] The removal of the clinic's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.
[64] The removal of the hospital's name, repeated throughout the document, is a non-substantive change made to conform with the Board's standard format in its past orders.

242.    While Expert #3 summarily opined that Respondent "met the standard of care in his treatment of [the Patient]" and "made appropriate decisions for the care of [the Patient], based on the information that [Respondent] was provided," Expert #3 was unaware of several important facts. First, Expert #3 was not aware that Nurse #1 had not taken any vital signs from the Patient in the last two days of his life and that Respondent had never asked for that information from Nurse #1. Second, Expert #3 was unaware that Nurse #1 had not conducted any physical examinations of the Patient, including her own assessment of the Patient's ability to stand or walk. Third, Expert #3 did not know Respondent and Nurse #1 were involved in a sexual relationship at the time.

243.    Expert #3 conceded that vital signs (such as temperature, blood pressure, pulse/heart rate, blood oxygen saturation, and respiratory rate) are the most basic measurement of a patient's overall health and are important, objective measures to be reviewed by treating physicians for "every patient." Expert #3 further acknowledged that vital signs would be "especially" important for an attending physician to know when treating a patient like the Patient, who was being monitored for high blood pressure.

244.    Ultimately, Expert #3 was not asked, and he did not provide an opinion, as to whether Respondent's failure to obtain more information from Nurse #1 regarding the Patient's vital signs and physical condition on September 1 and 2, 2018, fell below the minimal standard of acceptable and prevailing medical practice.

245.    Expert #3 opined that Respondent complied with the minimal standard of care when he recommended that the Patient be sent to the emergency room on August 30, 2018. However, Expert #3 was not aware that Respondent failed to follow up with the Administrator after learning that his directive for emergency services had been overruled. When confronted with this information, Expert #3 conceded that if an administrator were to overrule his medical directive, as

an attending physician, to send a patient to the hospital in an emergency situation, he would want to know why his instructions were not followed and he would want to have a direct conversation with the administrator.

246.    In sum, Expert #3 was not asked, and he did not provide, an opinion as to whether Respondent's failure to ensure that the Patient received emergency medical care on August 30, 2018, fell below the minimal standard of acceptable and prevailing medical practice. Expert #3 simply opined that Respondent's recommendation that the Patient be sent to a hospital for evaluation on August 30, 2018, was a correct one. Expert #3 did not address whether Respondent acted improperly by failing to ensure that his medical directive was completed.

247.    Expert #2's assessments and conclusions were better reasoned and more consistent with the evidence contained in the hearing record than those presented by Expert #3. The Judge, therefore, adopts the expert opinions of Expert #2, as set forth in these Findings.

## CONCLUSIONS

The Board has reviewed the record of this proceeding and hereby accepts the December 17, 2021 ALJ's Report and accordingly adopts and incorporates by reference the Conclusions of Law and Memorandum therein. Accordingly, the Board makes the following Conclusions:

1.    The Board and the Administrative Law Judge have jurisdiction in this matter pursuant to Minn. Stat. §§ 14.50, 147.141, 147.091 (2020), and Minn. R. 5615.0100 - .1300 (2021).

2.    Respondent received due, proper, and timely notice of the contested case hearing in this matter.

3.    The Committee has complied with all relevant procedural requirements of rule and law.

4.      This matter is, therefore, properly before the Board and the Administrative Law Judge.

5.      The Board is charged with the authority to impose disciplinary action, as described in Minn. Stat. § 147.141, against any physician who engages in conduct that violates any of the provisions of Minn. Stat. §§ 147.01 to .22 under Minn. Stat. §§ 147.091, 147.141.

6.      Disciplinary action may include: the revocation or suspension of a license or registration to perform interstate telehealth; the imposition of limitations or conditions on the physician's practice of medicine; the imposition of a civil penalty not exceeding $10,000 for each violation; the requirement that a physician provide unremunerated professional service; or the censure or reprimand of the physician under Minn. Stat. § 147.141.

7.      Before imposing disciplinary action, the Committee has the burden to prove, by a preponderance of the evidence, that the physician violated one or more of the provisions of Minn. Stat. §§ 147.01 to 147.22, including, specifically, the grounds for discipline set forth in Minn. Stat. § 147.091 under Minn. R. 1400.7300, subp. 5.

8.      A "preponderance of the evidence" means that the ultimate facts must be established by a greater weight of the evidence. 4 Minn. Prac.; CIV JIG 14.15 (2014). "It must be of a greater or more convincing effect and . . . lead you to believe that it is more likely that the claim . . . is true than . . . not true." *State v. Wahlberg*, 296 N.W.2d 408, 418 (Minn. 1980).

9.      Among the various grounds for which the Board may take disciplinary action against a physician, are the following:

•       Engaging in any unethical or improper conduct, including but not limited to conduct that demonstrates a willful or careless disregard for the health, welfare, or safety of a patient, in violation of Minn. Stat. § 147.091, subd. 1(g)(3);

- Engaging in unethical or improper conduct, including but not limited to conduct that may create unnecessary danger to any patient's life, health, or safety, in any of which cases, proof of actual injury need not be established, in violation of Minn. Stat. § 147.091, subd. 1(g)(5); and

- Engaging in conduct that departs from or fails to conform to the minimal standards of acceptable and prevailing medical practice, in which case proof of actual injury need not be established, in violation of Minn. Stat. § 147.091, subd. 1(k).

10.    The Committee has established by a preponderance of the evidence that Respondent failed to conform to the minimal standards of acceptable and prevailing medical practice when he: (1) failed to ensure the timely transfer of the Patient to the emergency room on August 30, 2018; (2) failed to obtain basic medical information about the Patient from his attending nurse on September 1 and 2, 2018, including vital signs and basic assessment results; and (3) failed to return the Patient to the hospital for emergency care on September 1 and 2, 2018.

11.    The Committee has established by a preponderance of the evidence that Respondent demonstrated a careless disregard for the health, welfare, or safety of the Patient when he: (1) failed to ensure the timely transfer of the Patient to the emergency room on August 30, 2018; (2) failed to obtain basic medical information about the Patient from his attending nurse on September 1 and 2, 2018, including vital signs and basic assessment results; and (3) failed to return the Patient to the hospital for emergency care on September 1 and 2, 2018.

12.    The Committee has established by a preponderance of the evidence that Respondent created an unnecessary danger to the Patient's life, health, and safety when he: (1) failed to ensure the timely transfer of the Patient to the emergency room on August 30, 2018; (2) failed to obtain basic medical information about the Patient from his attending nurse on September 1 and 2, 2018,

including vital signs and basic assessment results; and (3) failed to return the Patient to the hospital for emergency care on September 1 and 2, 2018.

13.     Accordingly, the Board has proper grounds to impose reasonable and appropriate disciplinary action against Respondent's license to practice medicine in the state of Minnesota pursuant to Minn. Stat. § 147.091, subd. 1 (g)(3), (5), and (k).

14.     An order by the Board taking reasonable and appropriate disciplinary action against Respondent's license is in the public interest.

15.     The form of disciplinary action the Board shall impose is beyond the province of the Administrative Law Judge.

16.     Based upon these Findings of Fact and Conclusions of Law, the Administrative Law Judge makes the following recommendation:   The Board should take reasonable and appropriate disciplinary action against the medical license of Respondent.

**The Administrative Law Judge's Memorandum**

On pages 65 through 74 of the ALJ's Report, the ALJ provided the following reasoning in support of the conclusions, which the Board adopts as follows:

Respondent contends that he cannot be held responsible for the negligent actions (or inactions) of his staff and others, or for the information he did not know when remotely providing and supervising the care of an inmate patient.  But this disciplinary action is not about the negligence of others; nor is it about what information Respondent knew or did not know.  Instead, it is about the information Respondent should have known and could have known – information the minimal standard of care required him to gather so that he could make appropriate medical decisions for his patient.  It is also about the duty of a doctor to protect a patient under his care and not abdicate that duty to others, including other medical or non-medical staff.

The Medical Practice Act, Minn. Stat. § 147.091, subd. 1, provides, among other things, that disciplinary action may be brought against a physician for the following:

- engaging in any unethical or improper conduct, including but not limited to conduct that demonstrates a willful or careless disregard for the health, welfare, or safety of a patient, Minn. Stat. § 147.091, subd. 1(g)(3);

- engaging in unethical or improper conduct, including but not limited to conduct that may create unnecessary danger to any patient's life, health, or safety, in any of which cases, proof of actual injury need not be established, Minn. Stat. § 147.091, subd. 1(g)(5); and

- engaging in conduct that departs from or fails to conform to the minimal standards of acceptable and prevailing medical practice, in which case proof of actual injury need not be established, Minn. Stat. § 147.091, subd. 1(k).

A preponderance of the evidence in this case establishes three distinct occasions in which Respondent's conduct fell below the minimal standard of acceptable and prevailing medical practice. First, Respondent failed to ensure the Patient's timely transfer to the emergency room on August 30, 2018, after the Administrator overrode Respondent's medical directive for a patient over whom Respondent had an ethical and professional duty to protect. Second, on both September 1 and 2, 2018, Respondent failed to obtain basic medical information about the Patient from his on-site medical staff that would have enabled him to make informed and proper medical decisions for the Patient's care. Finally, as a result of his failure to obtain necessary information from his on-site medical staff, Respondent neglected to return the Patient to the hospital for emergency care, when such care was clearly needed.

In each of these instances, Respondent's conduct demonstrates a careless disregard for the health, welfare, and safety of his patient, and created unnecessary danger to that patient's life, health, and safety. The resulting harm -- while none is required to be shown for a violation to exist -- was the tragic suffering and death of a young man. For these violations, disciplinary action is not only warranted, but is in the public interest to prevent a tragedy like this from ever recurring.

**Failure to Ensure the Patient's Timely Transfer to a Hospital on August 30, 2018**

Respondent's first ethical and professional breach was failing to ensure that the Patient was transported to a hospital on August 30, 2018, when the Patient's medical condition required urgent care and when Respondent's own on-site staff recommended that emergency care be provided. Instead, Respondent abdicated his duty to protect his patient to the administrative demands of non-medical jail staff. Such action failed to conform to the minimal standard of acceptable and prevailing care, created unnecessary danger to the Patient, and demonstrated a careless disregard for the Patient's health, welfare and safety.

On Friday, August 24, 2018, the Patient was transferred to the county jail for detainment on criminal charges. Jail surveillance video from his intake meeting depicts a vibrant and seemingly healthy young man. However, the Patient's initial health assessment, conducted the next day, uncovered a history of medical conditions uncommon for a man of his young age, including high blood pressure, recent respiratory failure, and ongoing migraine headaches.

By Monday, August 27, 2018, the Patient was complaining of numbness, as well as pain in his chest and lower extremities. The Patient exhibited continued high blood pressure and his EKG result read as an "abnormal." Consequently, Respondent directed that the Patient be treated with medication and regular blood pressure checks.

On Tuesday, August 28, 2018, the Patient's pain had not subsided and he reported a fall from his bunk. But by Tuesday night, the Patient's pain had become "excruciating," so much so that he sent a note pleading to be taken to the hospital. He was not.

On Wednesday morning, August 29, 2018, MEnD Nurse #3 conducted an assessment and physical examination of the Patient. Crediting correction officer reports that the Patient was faking his symptoms,[65] Nurse #3 called Respondent, the attending physician, to request direction. To ferret out untruthful claims, Respondent directed Nurse #3 to remove the Patient's access to a wheelchair and keep him in the medical segregation cell under constant video surveillance.

By Thursday morning (August 30, 2018), the Patient's symptoms had worsened. He had lost sensation from his waist down and had urinated on himself because he was unable to ambulate to the toilet. After conducting an examination, which included taking his vital signs, testing his reflexes, and inspecting his throat for swelling, Nurse #2 recognized that the Patient needed to be seen at a hospital with the proper equipment, staff, and resources to diagnose and treat his reported illness. Thus, she recommended to Respondent that the Patient be transported to an emergency room for urgent care. Respondent concurred with this recommendation.

Both experts in this case agreed that Respondent's directive (based upon Nurse #2's recommendation) to send the Patient to the hospital on August 30, 2018, was consistent with the reasonable standard of medical care. This instruction acknowledged the seriousness of the Patient's symptoms and the emergent need for medical assistance at that time.

Despite the Patient's obvious medical distress, readily apparent to Nurse #2, jail staff refused to acknowledge the Patient's symptoms or Nurse #2's assessment of them. Sometime

---

[65] This is not surprising considering MEnD's training materials and overall culture mock and belittle the individuals entrusted to their care.

around 1:30 p.m. on August 30, 2018, Nurse #2 informed Respondent that the Administrator overrode his medical directive to send the Patient to the emergency room because the jail viewed him as a "flight risk." But instead of calling the administrator himself to insist that the Patient receive necessary medical care, Respondent yielded to the administrator's will and discretion. In making this choice, Respondent abdicated his duty to protect his patient to a person without any apparent medical knowledge or training, and he put the interests of the facility and his company ahead of his patient's wellbeing.

It cannot be ignored that, as the founder and owner of MEnD, Respondent had a significant financial interest in maintaining a good business relationship with the jail and its administration. At the same time, as the MEnD chief medical officer overseeing the healthcare provided at the jail, and as the attending physician for the Patient, Respondent had overriding professional and ethical duties to ensure that his patient receive the care necessary to protect the Patient's health, life, and safety at all times. Respondent's first duty was to his patient, not to the convenience of jail administration or his company's client relations.

The minimal standard of care required Respondent to ensure that the Patient receive necessary and appropriate medical care to treat and diagnose his emergent condition on August 30, 2018. Given the severity of the Patient's symptoms that day, the minimal standard of care dictated that the Patient be taken to an emergency room immediately. Instead, Respondent acquiesced to the Administrator's dictate and left the Patient to suffer an additional day in a jail cell without any medical assistance, despite knowing that the Patient required urgent care.

Fortunately, when Medical Provider #1 arrived the next morning (Friday, August 31, 2018), she took charge of the situation and demanded the Patient's immediate transfer to a hospital. Medical Provider #1 did not hesitate; nor did she allow the Administrator to prevent her from

getting the Patient the medical attention he required. Medical Provider #1 took the swift and decisive action necessary to protect the Patient – action that Respondent neglected to take a day earlier.

The fact that the Patient was eventually transported to the hospital on Friday, August 31, 2018, after Medical Provider #1 intervened, does not remedy or negate Respondent's ethical violation on August 30, 2018. Minnesota Statutes section 147.091, subd. 1(g)(5) and (k), expressly provide that "proof of actual injury need not be established" when a physician's conduct fails to conform to the minimal standard of care or when such conduct creates an unnecessary danger to a patient's life, health, or safety. Here, however, resultant harm has been established by the evidence: the Patient suffered an additional day in the jail without proper medical attention before he was transferred to the hospital on August 31, 2018.[66]

By acquiescing to the will and discretion of the Administrator instead of advocating to ensure that his patient received the emergency care he needed on August 30, 2018, Respondent failed to conform to the minimal standard of acceptable and prevailing medical practice. This conduct created unnecessary danger to the Patient and demonstrated a careless disregard for the Patient's health, welfare and safety.

**Failure to Obtain Basic Medical Information from Staff Upon Which to Render Informed Medical Decisions for the Patient**

In the two days following the Patient's return from the hospital, Respondent demonstrated a dangerous pattern of practice whereby he neglected to obtain basic medical information about the Patient from his on-site staff and failed to ensure that his staff was conducting the necessary

---

[66] The fact that the hospitals failed to properly diagnose and provide medical treatment to the Patient on August 31, 2018, does not relieve Respondent from his duty to ensure the Patient's transport to the hospital on August 30, 2018, so that the Patient could be evaluated, diagnosed, and treated at that time.

assessments and evaluations so that he could competently direct the Patient's care. Specifically, Respondent: (1) blindly relied on incomplete, inaccurate, and subjective information provided by his romantic partner and subordinate employee, Nurse #1; (2) failed to reasonably question or test his staff's deficient (or nonexistent) assessments of the Patient; and (3) neglected to obtain basic, objective health data a reasonable doctor would need to make competent medical decisions about a patient's care. As a result, Respondent failed to conform to the minimal standard of acceptable and prevailing medical practice, created an unnecessary danger to his patient, and demonstrated a careless disregard for the health, welfare, and safety of his patient.

The Patient returned to the jail from the hospital in the early morning hours of September 1, 2018. The Patient's hospital discharge instructions, which were brought back to the jail with the Patient early that morning, specifically directed that the Patient should be "immediately" returned to the hospital if he showed symptoms of paralysis, numbness, facial drooping, difficulty speaking, worsening weakness, difficulty standing, loss of bladder or bowel control, or difficulty swallowing. In the two days preceding his death – September 1 and 2 – the Patient would exhibit each and every one of these warning signs. Yet Respondent did not direct the Patient's return to the hospital. Instead, Respondent contends that he was unaware of the extent to which the Patient's symptoms were worsening because he was not on-site to observe the Patient and the reports he was receiving from his staff painted a different picture. Therefore, Respondent asserts he did not violate any professional standards. Respondent is wrong in this conclusion.

As the owner and chief medical director of MEnD, Respondent assumed an express contractual duty to oversee the healthcare provided at the jail and ensure that MEnD staff were providing the type of care necessary to protect the life, health, and safety of the inmates at the jail. In addition, as the medical director for the jail and the attending physician remotely directing the

Patient's medical care, Respondent had the additional duty to critically test and examine his on-site staff's reports, as well as obtain basic medical data to enable him to direct the Patient's care. Respondent failed in each of these duties.

The evidence establishes that Nurse #1 arrived at approximately 11:22 a.m. on September 1, 2018, but did not bother to examine or assess the Patient, let alone check on him, until after 2:00 p.m., over 2½ hours later. When she finally did come to the Patient's cell at 2:05 p.m., she did not enter the room. She stood in the doorway, approximately ten feet away from the critically ill patient, for less than three minutes. She did not bother to check the Patient's vital signs; use her stethoscope to listen to the Patient's breath or heart sounds; assess his ability to swallow; test his muscle strength, reflexes, or ability to ambulate; or change his soiled brief and clothing. She did not even come near the Patient or touch him. After less than three minutes of "observing" the Patient from the doorway of his cell, Nurse #1 left and did not return to check on him for the rest of the day – that was the extent of the "care" MEnD provided to the Patient on September 1, 2018.

At approximately 5:30 p.m., Nurse #1 called Respondent to summarize the Patient's hospital records and update him as to the Patient's condition. Despite a history of hypertension and an abnormal EKG result, Respondent did not ask Nurse #1 for any of the Patient's vital signs – the most basic, objective measures of a patient's health. He did not ask his nurse to describe what nursing assessments or physical examinations she had conducted. He did not ask for the basic and pertinent information that a reasonable physician would need to evaluate the Patient's condition or the adequacy of his staff's care. Instead, Respondent blindly accepted what his nurse described – an inmate who was feigning an illness. Had Respondent asked Nurse #1 for the Patient's vital signs or what physical examinations or tests she performed on the Patient, he would have learned that she had conducted none; and that the extent of her "assessment" of the Patient

that day was her "observation" of the Patient from the doorway of his cell, ten feet away, for approximately three minutes.

The next morning, September 2, Nurse #1 returned to the jail. She found the Patient in a wheelchair, in the hallway, with urine dripping from his pantlegs. He was wearing a brief and clothing from two days earlier. He was talking out of only one side of his mouth and was unable to swallow. Despite these observations, Nurse #1 poured juice down his throat until he choked. She did not check his vital signs or use her stethoscope to listen to his throat, lungs, or heart. She did not test his reflexes, muscle strength, or his ability to ambulate.

At 11:00 a.m., Nurse #1 "peeked in" on the Patient through the one-foot-by-one-foot window of the cell door for approximately ten seconds. Because Nurse #1 did not come into the cell or assess him, she did not notice that the Patient was foaming at the mouth.

Ten minutes later, at 11:10 a.m., Nurse #1 spoke with Respondent to update him on the Patient's condition. Once again, Respondent asked for no objective evidence of the Patient's symptoms that would have permitted him to make an independent assessment of the Patient's condition. He did not ask for the Patient's vital signs. (Had he asked for that information, he would have learned that Nurse #1 did not take any vitals on the Patient that day.) Respondent did not inquire from Nurse #1 what assessments or physical examinations she had performed on the Patient (Had he asked her for such information, he would have learned that she had performed no tests or examinations on the Patient that day.) Ultimately, Respondent failed to obtain any pertinent information about the Patient and failed to ensure that his subordinate had performed the most basic evaluations of the Patient, including taking his vital signs or listening to his breath sounds, for more than two days while the Patient deteriorated.

Although the Patient was displaying each of the warning signs indicated on his hospital discharge instructions, which directed an immediate return to the hospital, Respondent did not return the Patient to the hospital. Instead, Respondent decided to take a "wait and see" approach. After all, the Patient was scheduled for a court appearance on September 4 and could be released on bail that day.

At 2:00 p.m., shortly before ending her shift, Nurse #1 "peeked in" again on the Patient through the small cell door window. While she saw him drooling, she did not bother to come into the room, check his vital signs, listen to his heart or breath sounds, or perform any examination of him. She simply left for the day.

At 4:46 p.m., a correction officer entered the cell and found the Patient completely unresponsive. For the first time that weekend, a MEnD medical technician was called into the cell by a correction officer to take the Patient's vitals. But it was too late. By 5:22 p.m., the Patient was pronounced dead.

The most generous interpretation of the two discussions between Respondent and Nurse #1 on September 1 and 2, is that Respondent did not ask the questions or obtain the information that the minimal standard of care required. A far more disturbing possibility is that Nurse #1 actually informed Respondent that she had done nothing to assess the patient or obtain critical health information, and Respondent accepted that woefully deficient level of care from his staff.

In attempting to defend the indefensible, Respondent asserts that it is not his fault that his director of nursing, Nurse #1, did not tell him about the Patient's deteriorating condition. Respondent also blames others who he claims provided him inaccurate or incomplete information, including doctors at both the hospitals. Respondent claims that he did nothing wrong, given the information that he had at the time. But Respondent's professional and ethical obligations

extended beyond relying upon the information that was immediately available to him. Respondent's professional and ethical duties required him to obtain and test the accuracy of the information he was relying on to provide (or not provide) healthcare to a patient. This is especially true in a correctional care setting where the attending physician is largely off-site and must rely on the reports of on-site staff.

In directing the care of a patient remotely, an attending physician must ask probing questions of his staff to ensure they are doing their jobs and competently assessing the patient. The attending doctor must also measure the subjective reports of on-site staff against the objective medical data that can be determined from the taking of simple vital signs (blood pressure, pulse, oxygen saturation, pulse rate, etc.).

Respondent emphasizes that he did not have access to jail video footage or the opportunity to personally observe the Patient because he was acting remotely. That is false. It was certainly within Respondent's power to go to the jail to make his own observations. Instead, he elected to act remotely. By making this choice, it was even more imperative that he ensure that he had accurate and complete information to make remote assessments. He chose to make his staff his eyes and ears. He had direct supervisory authority and contractual obligations, as well as professional and ethical responsibilities, to oversee his staff. A doctor cannot just ignore incompetent medical staff[67] and then rely on their judgment to make medical decisions for patients under the doctor's ultimate care.

---

[67] Nurse #1's reprehensible conduct does not excuse Respondent's abdication of responsibility to a patient under his care. In fact, it could be argued that Nurse #1's dereliction of duty and shocking indifference to the Patient's suffering suggests she was unconcerned about being held accountable by the attending physician – her direct supervisor and romantic partner.

The diagnosis of malingering made on August 31, 2018, would have alerted a reasonably competent and diligent physician to the need to closely monitor the Patient. As noted by Expert #2, a diagnosis of malingering is only made when all other causes have been ruled out. All three experts in this case agreed that a diagnosis of malingering is highly unusual. In addition, both Expert #2 and Expert #3 note that a diagnosis of malingering should be viewed with skepticism, especially when a patient continues to present with symptoms of serious illness. Consequently, it was imperative for Respondent and his staff to be particularly vigilant when the Patient returned to the jail to ensure that his condition was not worsening. This was especially true considering that the discharge instructions from the hospital warned that the Patient should obtain "IMMEDIATELY MEDICAL ATTENTION" at "AN EMERGENCY ROOM" if he displayed numbness, paralysis, facial drooping, difficulty standing, loss of bladder or bowel control, or difficulty swallowing. At a minimum, Respondent had a duty to monitor his patient's condition and inquire as to these specific symptoms when consulting with his staff. He did not.

Finally, Respondent contends that he cannot be held responsible for the negligent care of his nursing staff. But Respondent is not being held responsible for the negligence of his staff. He is being held responsible for his own negligent actions and inaction, for his own failure to obtain information and adequately supervise his staff.

This is not a situation where Respondent was merely a physician working for a hospital, alongside nursing staff, over whom he had little authority. Respondent's company, MEnD, undertook by contract the responsibility to provide competent and ethical medical care to inmates at the jail. The contract with the county specifically provided that MEnD shall provide a "medical director" to supervise all medical care provided to inmates, supervise MEnD nursing staff, and be available at all times to assist nursing staff or answer jail staff questions about inmate medical care

at the facility. On September 1 and 2, 2018, Respondent was serving in the capacity as the medical director for the facility. Therefore, he had final responsibility by contract to competently supervise the medical care provided to the Patient.

Respondent was also the chief medical officer of the MEnD corporation. As such, Respondent had the ultimate responsibility to ensure competent and proper healthcare to inmates confined in all facilities served by MEnD, as well as to oversee the work of MEnD staff in all facilities served by the company. In addition, under MEnD's own Correctional Care Policy, Respondent was the Responsible Health Authority (RHA) for all medical staff at the county jail. Under that policy, Respondent was ultimately responsible for reviewing all treatment provided by other healthcare providers to inmates (including healthcare provided by outside medical providers) and supervising the care provided to inmates by MEnD medical staff and jail correctional staff. The policy specifically provided that Respondent, as the RHA for the jail, had "the final judgment on all medical matters related to the healthcare of detainees that reside in each facility served by MEnD."

Accordingly, Respondent affirmatively assumed the responsibility to supervise his staff and ensure they were providing competent medical care to inmates confined in all facilities served by MEnD. Respondent cannot now hide behind the incompetent work of his medical staff, including his own girlfriend and MEnD director of nursing, who's work, judgment, and words he so blindly relied upon. It was not his staff's duty to ensure his treatment decisions were made upon sufficient information. As the Patient's attending physician, it was Respondent's duty to obtain sufficient information and ensure its reliability before determining that his patient required no further care. Whether this failure was the result of his romantic relationship with Nurse #1, the absurd notion that a single physician can appropriately care for somewhere between 7,200 and

9,600 inmates across five states, or sheer negligence, is immaterial. Respondent's duty to care for his patient with the minimal standard of care for medical doctors required him to obtain necessary information from his on-site staff. Whatever the reason for his ignorance, his ignorance is no defense.

Respondent, as the Patient's attending physician, the acting medical director for the facility, and MEnD's chief medical officer, had a duty to ask probing questions and ensure that the kind of basic assessments, tests, and examinations that a competent medical professional would conduct to properly evaluate a patient were undertaken. This is especially true for a patient who had just returned from a hospital and who was exhibiting clear signs of a serious illness, all of which were identified in the Patient's hospital discharge instructions as symptoms requiring an immediate return to the emergency room.

A physician must do more than hope his staff will provide him with the information needed to provide appropriate care – he must take reasonable measures to ensure it. In this case, Respondent is not being held responsible for what he could not know. He is being held responsible for what he would have known had he acted as a reasonable attending physician conforming to the minimal standard of care.

Respondent failed in his duty to the Patient as an ordinary attending physician by not conducting the necessary inquiry to render appropriate healthcare decisions for the Patient. That duty was heightened here, because as the owner and chief medical director of MEnD, and the acting medical director of the jail, Respondent assumed an affirmative duty to train and supervise his own MEnD staff, and to ensure that they were providing the type of care necessary to protect the life, health, and safety of their patients. By failing to verify his negligent subordinate's on-site reports in even a cursory fashion, Respondent breached his ethical and professional duties.

In sum, the evidence establishes that the minimal standard of acceptable and prevailing medical practice required Respondent to obtain basic health information from Nurse #1 on September 1 and 2, which he could have used to make informed medical decisions for a patient committed to his care. Instead, Respondent did not obtain critical information he should have known and the Patient was denied potentially life-saving medical treatment. By failing to conform to the minimal standard of care, Respondent demonstrated a careless disregard for the health, welfare, and safety of his patient, and created an unnecessary danger to the Patient's life, health, and safety. Accordingly, disciplinary action is warranted and in the public interest.

**Failure to Return the Patient to the Hospital on September 1 and 2, 2018**

As set forth above, as a result of Respondent's failure to obtain necessary medical data and information from his on-site staff, he neglected to return the Patient to the hospital for emergency care on September 1 and 2, when such care was clearly needed and expressly directed in his hospital discharge instructions. By neglecting to return the Patient to the emergency room on September 1 and 2, 2018, Respondent failed to conform the minimal standard of acceptable and prevailing medical practice. Respondent's conduct demonstrated a careless disregard for the health, welfare and safety of his patient, and created unnecessary danger to his patient's life, health, and safety. Accordingly, disciplinary action is warranted and in the public interest.

**Conclusion**

The Patient entered the county jail on August 24, 2018, a vibrant, seemingly healthy 27-year-old man. He was carried from that same jail nine days later to be laid to rest, after having endured days of suffering, begging those responsible for his care – medical providers and correction officers alike – for help that never came. His condition had already been dismissed by his custodians and "caregivers"– he was a criminal defendant feigning an illness, not a man

presumed innocent and in desperate need of care. And given their preconceived notions of inmates, no evidence could convince them otherwise. Even in his final hours, as he sat in a wheelchair, in filthy scrubs, with urine streaming down his legs, his caregivers would not believe him. As he laid unconscious, half-naked on the floor of his jail cell, white foam coming from his mouth, they still did not believe him. It took his death to convince medical professionals and jail staff that the Patient was not "malingering."

Given the egregious facts of this case, the Administrative Law Judge recommends that the Board impose significant and appropriate discipline against Respondent. The Judge further urges that the State of Minnesota investigate all who callously disregarded their duty to this man. Foremost among them are Nurse #1, the county jail, and jail staff. Scrutiny should also be applied to the contracts MEnD maintains with Minnesota counties and municipalities, and all the other medical providers who were involved in the Patient's "care" between August 25 and September 2, 2018.

A tragedy like this should never have occurred. And it must never be allowed to happen again.

## ORDER

Based on the foregoing Findings of Fact and Conclusions, the Board issues the following Order:

1.      NOW, THEREFORE, IT IS HEREBY ORDERED that the license of Respondent to practice medicine and surgery in the State of Minnesota is **SUSPENDED** effective March 1, 2022, for an indefinite period of time. Respondent must not engage in any act which constitutes the practice of medicine and surgery and must not imply by words or conduct that Respondent is authorized to practice medicine and surgery as defined in Minnesota Statutes chapter 147.

2.      IT IS FURTHER ORDERED that Respondent shall pay a $30,000 civil penalty to the Board within six months from the date of this Order.

3.      IT IS FURTHER ORDERED that Respondent may petition the Board to have the suspended status removed from his license no sooner than six months from the March 1, 2022, effective date of suspension.  Prior to petitioning for reinstatement of his license, Respondent shall submit a paper report for the Board President's review and approval establishing policies and procedures to improve his past practice and describing how such policies and procedures would be implemented.  The report shall include policies and procedures for:  1) appropriate assessments of patients; 2) the education and training of staff under Respondent's supervision; 3) monitoring and evaluating the effectiveness of staff education and training; and 4) measurement of improvements in the medical care of patients.  Upon reviewing his petition, the President may recommend the Board continue, modify, or remove the suspension or impose conditions or restrictions as deemed necessary.

4.      Respondent's violation of paragraph 1 of this Order shall constitute a violation of Minnesota Statutes sections 147.081 and 147.082 and provide grounds for the Board to seek injunctive relief to halt such violation.

Dated:  01 / 21 / 2022

                              MINNESOTA BOARD OF
                              MEDICAL PRACTICE

                              KIMBERLY W. SPAULDING, M.D., M.P.H.
                              President

89